UNITED STATES of America, ex rel.
Homer E. HANRAHAN, Petitioner,

v.

James H. THIERET, Warden,
Respondent.

No. 86 C 244.

United States District Court,
N.D. Illinois, E.D.

Aug. 23, 1988.

Marc R. Kadish, IIT, Chicago–Kent College of Law, Chicago, Ill., for petitioner.

Neil F. Hartigan, Atty. Gen., Scott Graham, Asst. Atty. Gen., Chicago, Ill., for respondent.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Homer Hanrahan ("Homer") and his son Michael Hanrahan ("Michael") were convicted in the Circuit Court of Cook County of various crimes relating to the 1974 death of Marian Hanrahan ("Marian"), Homer's wife and Michael's mother. Homer has now filed his second effort at a 28 U.S.C. § 2254 ("Section 2254") petition for writ of habeas corpus against Menard Correctional Center Warden James Thieret ("Thieret").[1] For the reasons stated in this memorandum opinion and order, this Court finds no evidentiary hearing is required and dismisses the Petition on the merits.

### Background and Procedural Posture

Nearly six years have elapsed since this Court dismissed Homer's original request for Section 2254 relief for failure to exhaust state court remedies (*United States ex rel. Hanrahan v. Bosse*, 547 F.Supp. 721 (N.D.Ill.1982)). After Homer then brought an ultimately unsuccessful post-conviction petition, he filed a new Section 2254 petition in this action, initially acting pro se. This Court then appointed counsel to assist Homer in the presentation of his claims, and counsel filed the Amended Petition (the "Petition") on Homer's behalf.

As called for in Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts,[2] Thieret has answered the Petition and filed a transcript of the state trial court proceedings.[3] It has taken an inordinate amount of time to get matters into condition for the current decision (not the least of the problems being extended delays because of lost or misplaced state court files and the need for multiple briefings, see n. 5).

Homer attacks his June 4, 1976 convictions for murder, aggravated kidnapping, aggravated battery and conspiracy on various grounds, including (1) asserted violations of his Sixth Amendment right to confront the witnesses against him[4] and (2) the claimed ineffective assistance of both his trial and appellate counsel. All the issues have been fully briefed.[5]

---

**1.** Astonishingly enough in light of this District Court's random case assignment system, the luck of the draw also assigned to this Court's calendar Michael's separately filed Section 2254 petitions. This Court has reviewed, and in each instance dismissed, three petitions from Michael (*United States ex rel. Hanrahan v. Bosse*, 547 F.Supp. 718 (N.D.Ill.1982), aff'd mem., 723 F.2d 67 (7th Cir.1983) ("*Hanrahan I*"); *United States ex rel. Hanrahan v. Welborn*, 591 F.Supp. 252 (N.D.Ill.1984), aff'd mem., 774 F.2d 1167, cert. denied, 474 U.S. 1104, 106 S.Ct. 891, 88 L.Ed.2d 925 (1986) ("*Hanrahan II*"); *United States ex rel. Hanrahan v. Gramley*, 664 F.Supp. 1183 (N.D.Ill.1987) ("*Hanrahan III*")). This opinion will draw on those earlier decisions where relevant to the claims Homer is now advancing.

**2.** All further citations to those Rules will take the form "Rule—."

**3.** That transcript comprises eight volumes containing the common law record, the Circuit Court transcript of hearings on pretrial motions, the Circuit Court trial transcript and the transcript of Michael's post-conviction proceeding. In conformity with the parties' usage, this opinion will refer to the record by category ("R." for the pretrial hearings and "T." for the trial transcript) and then by page numbers.

**4.** In accordance with by-now universal usage (because it is convenient, even though conceptu-ally inaccurate), this opinion will refer directly to the Bill of Rights provisions deemed incorporated by the Fourteenth Amendment rather than to the latter Amendment itself (though it is of course the sole source of the claimed constitutional protections against state action).

**5.** After the parties had completed their scheduled briefing of the issues raised by the Petition, this Court twice ordered further briefing of additional issues. Thus a brief guide to the parties' memoranda will be helpful, with "P." being used to refer to Homer (as petitioner) and "R." being used to refer to Thieret (as respondent):

1. Homer's original and reply memoranda will be cited "P. Mem. I" and "P. Mem. II" respectively. Thieret's original memorandum is cited "R. Mem. I."

2. Homer's and Thieret's first round of supplemental briefs discussing the impact of the decision in *Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987) are respectively cited "P. Mem. III" and "R. Mem. II."

3. Homer's final submission on the issue of harmless error is "P. Mem. IV." Thieret submitted two memoranda on that issue: "R. Mem. III," soon supplemented by "R. Mem. IV."

## Facts

Homer and Michael were tried jointly on the charges stemming from Marian's death. At trial the jury heard differing versions of the relevant events, including statements made by Homer and Michael to police and prosecutors and the account Homer presented in his trial testimony. Michael did not take the stand.

Because of the fact-intensive nature of some of Homer's claims, a detailed factual presentation is necessary. Rather than reinventing the wheel, this opinion reproduces as its Appendix the factual discussion from West's Illinois Decisions version (20 Ill.Dec. at 868–71) of the Illinois Appellate Court decision on Homer's and Michael's direct appeal (64 Ill.App.3d 207, 20 Ill.Dec. 866, 380 N.E.2d 1075 (1st Dist.1978)).

Additional facts will be set out as necessary in discussing Homer's legal arguments. However, because of the central role occupied by Michael's statement to Officer Raymond Giovannelli ("Giovannelli") incriminating Homer (see App. at 868–69), some elaboration on that statement is appropriate now.

Giovannelli testified Michael gave that statement about 8:30 a.m. November 22 (T. 323).[6] Giovannelli also testified Michael had made an earlier statement upon his arrival at the station at about 7:00 a.m. (T. 215). Michael had then spoken of an argument with his mother on Wednesday evening, November 20, when he had slapped her, but he said he had seen his mother and father leave the family home at about noon on Thursday November 21 (T. 220).

Homer's counsel George Downs ("Downs") assented to the introduction of Michael's 8:30 a.m. November 22 statement during the cross-examination of Giovannelli by Michael's counsel Lawrence Suffredin ("Suffredin") (T. 303–06, 315–17), despite the prosecution's earlier agreement *not* to introduce Michael's alleged statement without redaction (R. 637–39). However, later in the trial, during the testimony of Assistant State's Attorney ("ASA") Gino DiVito ("DiVito"), Downs did interpose an objec-

tion under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) to Michael's more detailed unredacted statements given to DiVito early on Saturday morning November 23 (T. 739–42).

## Pretrial, Trial and Appellate Proceedings

Before trial both defendants moved to sever their cases (R. 633–37). Judge Wayne Olson denied severance, relying in part on the agreement of ASA George Pappas ("Pappas") to redact from either defendant's statements admitted at trial any inculpatory references to his co-defendant (R. 637–39, 644–48). Homer and Michael also moved to quash their arrests, to suppress physical evidence seized by the police and to suppress statements made to the police after their arrests. After hearing extensive testimony Judge Olson denied each motion, finding there was probable cause for defendants' arrest, the police searches were reasonable and defendants' statements were made voluntarily and in compliance with the safeguards attendant to custodial interrogation (R. 626–32). Finally defendants attempted to disqualify Pappas from acting as prosecutor at trial, given his pretrial role in the investigation of the case (R. 663–70). Judge Olson denied that motion, finding no need for Pappas to appear as a witness at trial and no prejudice to defendants from his prosecuting the case (R. 668–71).

On the brink of trial—in fact after the completion of jury selection—Judge Robert Collins replaced Judge Olson in presiding over the case because of an illness in Judge Olson's family (T. 4). At trial the evidence included the various accounts of the events beginning Wednesday evening November 20, as set out in the Appendix. In addition the state produced physical evidence recovered from the Hanrahan family home, the home of Homer's girlfriend Roberta Stiles ("Stiles") and Michael's car and fraternity house room:

 1. a bag of various drugs, including Sparine, and syringes;

---

**6.** All dates in this opinion refer to the year 1974 unless otherwise specified.

2. guns, including a handgun with traces of human blood;

3. sheets, towels and a blanket;

4. a bottle that had contained chloroform; and

5. clothing from both Homer and Michael containing bloodstains.

Finally for present purposes,[7] the State presented the testimony of two experts. Dr. Eupil Choi ("Choi"), the coroner who performed the autopsy on Marian, testified the cause of death was acute morphine intoxication (T. 546, 568), with bruises to Marian's head and body being only a secondary cause of death or a contributing factor (T. 573, 578). As to those bruises, Choi testified there were no indications that any bleeding had resulted and no skull fracture had occurred (T. 564–66). George Christopoulos ("Christopoulos"), the chief toxicologist for the Cook County Coroner, testified as to the results of tests performed on samples from Marian's blood, urine and bile. He found a toxic level of morphine in her bile (T. 670–71), in addition to other substances in her system: a non-lethal amount of the tranquilizer Sparine (also known as promazine) (T. 697–98), a small amount of alcohol, a trace amount of chloroform and a non-lethal amount of barbiturates (T. 666–69, 684). Christopoulos also testified that of the drugs recovered by the police from the various locations, only one could be a source of morphine: Codeine in the cough medicine "Phenergan" could break down into morphine (T. 674), though five to ten "little bottles" (referring to a trial exhibit) would be required to account for the level of morphine found in Marian (T. 688).

As part of his defense, Homer presented the testimony of Ray Moehring ("Moehring"), a representative from Wyeth Laboratories, the company for which Homer had worked as a sales representative for nine months in 1967–68. Moehring testified the company's sales representatives were never given samples of hard narcotics such as morphine to distribute to doctors (T. 1220), although Wyeth did sell morphine (T. 1236).

At the end of the ten-day trial on June 4, 1976, the jury found both defendants guilty of conspiracy,[8] aggravated battery and aggravated kidnapping (T. 1741–42). On the murder charges, Homer was found guilty and Michael was acquitted (T. 1742). Homer was sentenced by Judge Collins to concurrent sentences of 50 to 100 years on the murder charge, 20 to 40 years for aggravated kidnapping and 3 to 10 years for aggravated battery (T. 1862). Michael received a 10 to 25 year sentence for aggravated kidnapping, with a concurrent term of 3 to 10 years for aggravated battery (T. 1863).

On appeal Homer and Michael were jointly represented by Suffredin, who had been Michael's trial counsel. After reciting the facts reproduced in the Appendix, the Appellate Court held:

1. There had been probable cause for Michael's arrest, so the evidence and statements derived from his arrest were properly admitted.

2. Homer's severance motion was properly denied because any *Bruton* violation was negated by the "interlocking confessions" rationale of *People v. Rosochacki*, 41 Ill.2d 483, 244 N.E.2d 136 (1969).

3. There was no error in allowing Pappas to serve as prosecutor at trial, as his role in the pretrial investigation was "relatively minor" and there was no prejudice to defendants.[9]

7. This is not an exhaustive account of the trial testimony. Witnesses identified in the text presented information on additional topics, and there were other witnesses not referred to in the text. Additional members of the Hanrahan family testified both in the state's case-in-chief and in rebuttal. There was also testimony from police personnel and technicians as to other physical evidence, such as fingerprints. None of that additional information is necessary for consideration of the issues presented by the Petition.

8. Instructions to the jury had covered theories of conspiracy to commit either aggravated battery or aggravated kidnapping or both (T. 1719–22). There was nothing in the jury verdict specifying on which conspiracy charge or charges defendants were found guilty.

9. In addition, the Appellate Court:
1. found the trial court had properly refused Homer's proffered instruction on involuntary manslaughter (an issue Homer does not advance in the Petition) and

Later the Illinois Supreme Court denied Homer's petition for leave to appeal (72 Ill.2d 583) and the United States Supreme Court denied his petition for certiorari (444 U.S. 828, 100 S.Ct. 53, 62 L.Ed.2d 36 (1979)).[10]

As already noted, this Court dismissed Homer's first habeas corpus petition, requiring him to pursue possible post-conviction relief under Ill.Rev.Stat. ch. 38, ¶¶ 122-1 to 122-7. Homer then filed a pro se petition for post-conviction relief, which was adopted by his appointed counsel. On September 22, 1983 Judge Collins dismissed the petition orally without elaboration. Next the Appellate Court affirmed that dismissal without an evidentiary hearing, finding most of Homer's claims had either been decided or waived on the direct appeal (132 Ill.App.3d 640, 640-41, 87 Ill.Dec. 892, 893, 478 N.E.2d 31, 32 (1st Dist.1985)). As for Homer's claims of ineffective assistance of counsel, the Appellate Court found (1) there were no affidavits or other supporting evidence to demonstrate flawed handling by trial counsel and (2) there was no indication the appellate counsel had been ineffective (*id.* at 641-42, 87 Ill.Dec. at 894, 478 N.E.2d at 33). Again Homer unsuccessfully sought leave to appeal to the Illinois Supreme Court (108 Ill.2d 579 (1985)).

That finally exhausted Homer's state court remedies. He then returned to this Court to renew his request for federal habeas relief.

### Theories and Standards

Homer's Petition raises five grounds for habeas relief:[11]

1. Homer's Sixth Amendment right "to be confronted with the witnesses against him" was violated when the trial court refused to grant his motion for severance and when Michael's state-ments inculpating Homer were admitted at trial (the *"Bruton* Violation Claim").

2. Homer was denied the effective assistance of counsel on his direct appeal (also in violation of the Sixth Amendment) because Suffredin, who had a conflict of interest through his joint representation of both Homer and Michael (and from his earlier representation of Michael at trial), failed (a) to challenge the effectiveness of Homer's trial counsel and (b) to raise Homer's Fourth Amendment claims adequately (the "Ineffective Assistance of Appellate Counsel Claim").

3. Homer's Sixth Amendment Confrontation Clause rights were violated by his inability to cross-examine Pappas, one of the prosecutors at trial, who became an "unsworn witness" against Homer (the "Pappas-as-Prosecutor Claim").

4. Homer's Sixth Amendment rights were also violated by the ineffectiveness of trial counsel Downs, who failed:

 (a) to object to the introduction of the statements by Michael that constitute the *Bruton* Violation Claim;

 (b) to present exculpatory forensic evidence;

 (c) to cross-examine the state's expert witnesses adequately; and

 (d) to present evidence of the bias of various prosecution witnesses

 (the "Ineffective Assistance of Trial Counsel Claim").

5. Homer's Fifth Amendment right to a fair and impartial trial was violated when he rejected a purported $40,000 bribe solicitation by Judge Olson, who then ruled against Homer on various pretrial motions (the "Bribe Solicitation Claim").

All those contentions must be examined in light of the controlling principles restated in *Cole v. Young,* 817 F.2d 412, 416 (7th Cir.1987) (citations omitted):

2. rejected Michael's contention that his conviction for aggravated kidnapping should be reversed as legally inconsistent with his acquittal for murder, a charge that included a felony-murder theory.

**10.** Additional post-conviction steps taken by Michael and Homer, but not relevant to the current proceeding, are omitted.

**11.** This is the order in which Homer presents his claims. This opinion will address them in a somewhat more logical sequence.

The only basis for granting federal habeas relief is a violation of federal statutory or constitutional law.... "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension."

Each of the standards for federal review of state criminal proceedings is also relevant. Section 2254(b) grants the factual findings of the state courts (both trial and appellate) a presumption of correctness. At the other extreme, where Homer's claims implicate pure questions of law this Court takes a de novo approach to the issue (see *Miller v. Fenton*, 474 U.S. 104, 110, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985)). As for mixed questions of fact and law, such as Homer's ineffective assistance of counsel claims (*Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984)), this Court must undertake an "independent review" (*Sullivan v. Fairman*, 819 F.2d 1382, 1393 (7th Cir. 1987))—except that subsidiary factual determinations by state courts within that ineffective assistance of counsel inquiry "are subject to the deference requirement of [Section] 2254(d) ..." (*Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070).

### Exhaustion

Thieret does not dispute Homer's exhaustion of his state court remedies as required by Section 2254(b). This Court agrees that Homer has now cured that problem presented by his first Section 2254 petition. Unfortunately the other Section 2254 threshold issue—waiver—cannot be resolved quite so simply.

### Waiver

Thieret says Homer has waived at least parts of four of his five claims by failing to raise them in his various state court proceedings. Only Homer's claim based on Pappas' role at trial is unaddressed by Thieret's waiver argument.[12]

---

**12.** As will be discussed shortly, Thieret may have had grounds for a waiver argument as to

Habeas petitioners can unquestionably waive claims through procedural defaults in their state proceedings (e.g., *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)), excusable only upon a showing of cause and prejudice (*United States ex rel. Spurlark v. Wolff*, 699 F.2d 354, 357–61 (7th Cir.1983)). Here the analysis is somewhat complicated by the fact that Homer's ineffective assistance of counsel claims, if successful, may establish "cause" for other procedural defaults (see *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645–46, 91 L.Ed.2d 397 (1986)). In any event, the waiver question is best approached on a claim-by-claim basis.

#### 1. Bruton Violation Claim

Homer faces a multi-layered waiver problem on his *Bruton* claim. At trial his lawyer made no objection to the admission of Michael's statement forming the basis of that claim (T. 303–06, 315–17). Such a failure to object is a classic instance of procedural default, for in Illinois (*People v. Baynes*, 88 Ill.2d 225, 230, 58 Ill.Dec. 819, 821, 430 N.E.2d 1070, 1072 (1981) (citations omitted)):

> It is a general rule that an objection to the introduction of evidence must be made at the time of admission or it will be treated as waived.

Then Homer's appeal also failed to assert any *Bruton* claim, again a prototypical waiver of the issue.

Homer addresses that twofold waiver problem by relying on a two-step claim of ineffective assistance of counsel. First he urges his trial lawyer Downs' failure to object to the inculpatory statement by Michael, as recounted by Giovannelli, was constitutionally inadequate (P.Mem. I–23). Then to escape the loss of that claim via its waiver on appeal (*Spurlark*, 699 F.2d at 356), Homer argues his appellate counsel Suffredin also violated his right to counsel by failing to raise Downs' consent to the alleged *Bruton* violation (P.Mem. I–10–11). Those dual attacks on the performance of

---

the Pappas-as-Prosecutor Claim as well.

Homer's trial and appellate counsel might, if successful in tandem, establish the "cause" element to overcome Homer's forfeiture at trial of the *Bruton* claim.

Thieret responds by offering a linked argument of his own: Michael's challenged comments did not in fact violate Homer's Confrontation Clause rights under *Bruton,* so Downs was not ineffective for failing to object at trial, nor was Suffredin at fault for not appealing Downs' performance (R.Mem. I–5–8). Given that line of attack, it is preferable to defer consideration of whether Homer has waived his *Bruton* claim until after consideration of that claim on the merits. If no *Bruton* error occurred—or more importantly if any *Bruton* error was *harmless*—Homer cannot establish the prejudice component required for both ineffective assistance claims (*Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064) or required to excuse the procedural default.

## 2. *Ineffective Assistance of Appellate Counsel Claim*

Apart from the *Bruton*-related issue (to be deferred for the reason just stated), Homer challenges the level of representation by his appellate counsel Suffredin in two respects (Petition at 12–13, P.Mem. I–11):

 1. Suffredin failed to raise on appeal the illegal search of Homer's car trunk.

 2. "Suffredin refused to raise certain issues on appeal which [Homer] believed were critical to the success of the appeal" (though Homer nowhere identifies those issues).

Thieret responds that those claims were waived on Homer's post-conviction petition.

▪ Procedural default can occur in a post-conviction proceeding as well as at trial or on direct appeal (see *United States ex rel. Devine v. DeRobertis,* 754 F.2d 764, 768 (7th Cir.1985)). Thieret argues (R.Mem. I–9):

[A]s the state appellate court noted, petitioner, upon raising the claim during post-conviction proceedings, did not file supporting affidavits or other evidence. Therefore petitioner waived consideration of the allegations and ... procedural default bars consideration of the claims in this Court.

But that mischaracterizes the Appellate Court's decision, which rejected only the claimed deficiencies of Homer's *trial* counsel by reason of Homer's failure to provide supporting affidavits or other evidence (132 Ill.App.3d at 641, 87 Ill.Dec. at 894, 478 N.E.2d at 33).[13] As to Homer's claims of ineffective *appellate* counsel, the court affirmed the Circuit Court on the merits (albeit in few words) (*id.*).

Thieret is thus wrong in asserting Homer waived his claim of ineffective appellate counsel. This opinion will therefore have to reach the merits of that claim.

## 3. *Pappas–as–Prosecutor Claim*

Thieret could well have urged a waiver defense to Homer's claim regarding Pappas' role at trial. In dealing with Michael's third habeas petition, this Court held Michael's claim under the Confrontation Clause (the same substantive argument Homer now makes) was entirely different from the claim both Michael and Homer raised on direct appeal (*Hanrahan III,* 664 F.Supp. at 1189–90). What both then argued in the Appellate Court was that Judge Collins had erred in allowing Pappas to prosecute the case because both Hanrahans were prejudiced by references at trial to Pappas' role in the investigation of the case (64 Ill.App.3d at 216, 20 Ill.Dec. at 873, 380 N.E.2d at 1082). This Court thus held Michael had waived his entirely separate Confrontation Clause claim by never presenting it to the state court (*Hanrahan III,* 664 F.Supp. at 1190).

▪ Nevertheless, Thieret has not made that same waiver contention here. Hence Thieret's waiver of the waiver argument requires this Court to address the claim on the merits (see *Barrera v. Young,* 794 F.2d

---

**13.** For the moment, this opinion ignores the question whether Homer's failure to provide evidentiary support for the claims in his post-conviction petition constitutes procedural de-fault. That issue will be considered shortly in the context of Homer's charges against his trial counsel.

1264, 1269 (7th Cir.1986) (district court should not refuse to accept such a waiver)).

### 4. *Ineffective Assistance of Trial Counsel*

As with Homer's appellate counsel claims, his arguments addressed to Downs' performance as trial counsel also fall into two categories for waiver purposes. Homer says Downs provided constitutionally ineffective assistance by failing (P.Mem. I–23):

> 1. to object at trial to the admission of Michael's statement that constitutes the alleged *Bruton* violation; and

> 2. to present exculpatory forensic evidence, to prepare sufficiently to cross-examine the state's experts and to present evidence of the bias of the state's witnesses.[14]

Thieret urges that first claim was waived when Suffredin failed to raise it on the direct appeal (R.Mem. I–6). As with the *Bruton* claim itself, the question whether any such waiver is excused is best deferred until the *Bruton* claim is reviewed on the merits.

As for the second set of claims, they all rely on evidence outside the trial record and thus could not have been brought on direct appeal (see *United States ex rel. Tonaldi v. Elrod*, 782 F.2d 665, 667–68 (7th Cir.1986); *People v. Edmonds*, 79 Ill.App. 3d 33, 37, 34 Ill.Dec. 555, 558–59, 398 N.E. 2d 230, 233–34 (1st Dist.1979)). That then necessitates examination of Homer's state court post-conviction petition.

As to that proceeding Thieret argues (in the language from R.Mem. I–9 quoted earlier in connection with Homer's appellate counsel claims) that Homer's failure to include supporting affidavits or other evidence with his post-conviction petition constitutes procedural default.[15] Homer does not answer by saying that omission does *not* constitute a waiver, nor does he say Thieret has waived the argument by failing to assert it with clarity (see n. 15). Instead Homer gives only this cryptic response to the waiver argument (P.Mem. II–3):

> The reason no such supporting affidavits or other evidence were filed is clear from the record, a record which [Thieret] chooses to ignore.

What Homer labels as "clear from the record" is not clear to *this* reader of the record. It would seem he may have confused the matter with his direct appeal, as to which he contends Suffredin's conflict of interest prevented zealous advocacy on Homer's behalf. Nothing in the record (or in Homer's filings in this case) suggests any reason that Homer's post-conviction proceeding could not have provided substantiation, by affidavit or other means, of the information Downs allegedly ignored and the steps he alleged failed to take. Although Homer filed his post-conviction petition pro se, counsel was appointed to assist him. That attorney conferred with Homer, found he had nothing else to give her in connection with the petition, and accordingly did not seek to supplement the submission by Homer (see transcript of Sept. 22,

---

**14.** Homer also contends that Downs suffered from alcoholism that interfered with his performance during the trial.

**15.** Thieret's briefing of this topic is somewhat obscure. R. Mem. I–9 explicitly advances the waiver argument as to Homer's appellate counsel claims. Two pages later the memorandum turns to Homer's trial counsel claims and, in just two sentences, states Homer received effective assistance of counsel at trial—though the brief section also carries an obviously wrong heading (R. Mem. I–11):

> PETITIONER RECEIVED EFFECTIVE ASSISTANCE OF APPELLATE [SIC] COUNSEL. For the reasons previously indicated, petitioner received effective assistance of trial counsel. For this reason, appellate counsel was

not ineffective in failing to challenge trial counsel's incompetence.

That terse statement does not in terms repeat the waiver argument made two pages earlier—an argument that has equal force as to both sets of Homer's ineffective assistance of counsel claims. And to be sure, the Attorney General's office is free to waive a waiver argument on behalf of the state (*Barrera,* 794 F.2d at 1269). But under the circumstances it would be odd to read such a waiver into the somewhat garbled response to the trial counsel claim. Homer's responsive filing gives no indication of having read Thieret's submission as a waiver. This opinion therefore proceeds on the premise that Thieret did *not* waive the argument that Homer's ineffective trial counsel claims were waived in post-conviction proceedings.

1983 proceedings before Judge Robert Collins, at 4–5).

■ Thus Homer has presented no "cause" for his failure to substantiate his post-conviction claims as to Downs' performance.[16] That calls for consideration of the remaining question (one not addressed by Homer): whether that failure in fact constitutes a procedural default for habeas purposes.

There is no question the Illinois Post-Conviction Hearing Act requires the kind of supplementation the Illinois Appellate Court found wanting (Ill.Rev.Stat. ch. 38, ¶ 122–2):

> The petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or state why the same are not attached.

Illinois courts have frequently upheld the dismissal of post-conviction petitions without evidentiary hearings when the petitioners have not supplied supporting material. In the setting of similar ineffective assistance of counsel claims, *People v. Carmickle*, 97 Ill.App.3d 917, 920, 53 Ill.Dec. 665, 667, 424 N.E.2d 78, 80 (3d Dist.1981) (citations omitted) held:

> When a defendant attacks competency of counsel for failing to call or contact certain witnesses, he must attach affidavits of these witnesses to his postconviction petition and explain the significance of their testimony.... The defendant has failed to meet these requirements and hence was not entitled to a hearing on his claim that he was denied the effective assistance of counsel.

And *Carmickle* was so quoted and cited in the Appellate Court's affirmance of Judge Collins' dismissal of Homer's post-conviction petition (132 Ill.App.3d at 64, 87 Ill. Dec. at 894, 478 N.E.2d at 33).

This Court has uncovered no case in which a federal habeas court has explicitly held the failure to provide evidence supporting an Illinois post-conviction petition constitutes a waiver of claims in a later habeas proceeding. But the principles behind the waiver and exhaustion requirements in Section 2254 proceedings seem fully applicable to failure to comply with that state procedural requirement. Homer's omissions in the state proceeding prevented the Illinois state courts from addressing the merits of his claim.

Federal courts give deference to a state's procedural requirements (cf. *Buelow v. Dickey*, 847 F.2d 420, 425 (7th Cir.1988) (federal court must respect a state court's finding of waiver and support the integrity of the state's rules)). State courts should always be given the opportunity to correct errors—even federal constitutional errors—before a defendant seeks federal habeas relief (*Phillips v. Lane*, 787 F.2d 208, 211 (7th Cir.), *cert. denied*, 479 U.S. 873, 107 S.Ct. 249, 93 L.Ed.2d 173 (1986)). Here Homer denied the Illinois courts the opportunity to address his charges of ineffective trial counsel. He should not be able to withhold information in his state proceedings and then demand an evidentiary hearing in the federal habeas court. Accordingly, Homer has indeed waived his claims as to Downs' performance—except, as previously stated, for his challenge to Downs' failure to defend his *Bruton* rights.

### 5. *Bribe Solicitation Claim*

■ As for Homer's claim that Judge Olson attempted to extort $40,000 from him in return for favorable pretrial rulings, Thieret argues (this time plain as day) that claim was waived by Homer's failure to include it in his post-conviction petition (R.Mem. I–12). Although Homer at first said incorrectly he had included the claim in his state petition (Petition at 20; P.Mem. I–25), he has since acknowledged that the current action is the first time he advanced the bribe solicitation claim. Homer now

---

**16.** If Homer (with nothing but time on his hands) runs true to form, this conclusion could generate yet another claim of ineffective assistance of counsel—this time in the post-conviction proceeding. Mercifully, Homer has not added such a claim to the present action. Before Homer views this comment as an invitation to advance a claim to that effect in this or any other court, he should consider whether he has waived the argument by failing to make it in this current proceeding (or does that trigger a claim that his counsel *here* was ineffective?).

responds to Thieret's waiver argument this way (P.Mem. II–15):

> However, Petitioner's allegation had no corroboration until Judge Olson pled guilty. Had Petitioner raised this argument before Olson's guilty plea, a judge would have looked disfavorably at such a claim. Therefore, Petitioner waited until this time to make this allegation.

This Court rejected that selfsame argument on Michael's third habeas petition. Michael too claimed he could not have come forward with his charges against Judge Olson until they were substantiated by the federal prosecution of Olson. This Court characterized that as "nonsense" (*Hanrahan III*, 664 F.Supp. at 1189) and went on to say (*id.*, emphasis in original):

> Michael speaks as though *his* second-hand testimony would have been alone against the world—but the bribe-solicitation claim would rather have rested on direct testimony by Suffredin and Downs, recounting their conversation with Judge Olson before the hearing. That evidence existed in 1978, and Michael knew it. Judge Olson's guilty plea seven years later in an unrelated case undoubtedly made the previously existing available evidence more believable, but it certainly did not provide—for the first time—the "evidence by which to substantiate" Michael's claim.
>
> To put it another way, Michael's "cause" for not advancing the bribery claim in the direct appeal or post-conviction hearing is *not* that he "had absolutely no evidence" to support the claim but rather that he did not think the evidence would

be believed. That does not constitute "cause" (in *Wainwright v. Sykes* terms) for Michael's failure to assert the bribery claim in the state courts (cf. *Engle v. Isaac*, 456 U.S. 107, 130, 102 S.Ct. 1558, 1573, 71 L.Ed.2d 783 (1982)).

That applies with equal force to Homer. He has shown no cause for his procedural default.[17]

On Michael's claims this Court went on to find (*id.*) there was also no showing of prejudice, the second element required under *Wainwright*. Homer makes a slightly different argument on the prejudice front, contending he lost the opportunity to present his pretrial motions to an impartial judge (P.Mem. II–15–16):

> If Judge Olson solicited a bribe and did not receive the money, the waters of justice were polluted for Petitioner. That pollution destroyed all of the constitutional safeguards a defendant is entitled to have.... If Petitioner's allegations are true, the decision of a judge who solicited a bribe, right or wrong, should not stand.

Though persisting in his waiver argument, Thieret appears to agree by stating "if petitioner's allegations are true, he did not receive a full and fair hearing and this Court should reach the merits of the claim" (R.Mem. I–13).

It is an unusual and difficult question whether Homer has in fact been prejudiced if Olson reached the correct legal decision for the wrong (and perhaps illegal) reasons.[18] Fortunately that troublesome issue

---

**17.** Just last month our Court of Appeals was confronted with a waiver question in a case involving similar allegations of judicial corruption. *Branion v. Gramley*, 855 F.2d 1256, 1266–68 (7th Cir.1988) involved a charge that Judge Reginald Holzer (like Judge Olson a member of the dubious Greylord fraternity) had requested a bribe to enter judgment n.o.v. after a jury had found Branion guilty of murdering his wife. Judge Holzer reputedly was talked out of the scheme by then-prosecutor Patrick Tuite, through improper ex parte contacts, when the prosecutor caught wind of the developments. When Branion belatedly challenged the prosecutor's ex parte contacts with the judge in his habeas petition, the Court of Appeals resolved the waiver question by finding no prejudice

from the judge having been talked out of a "corrupt acquittal" in an arguably improper manner. Its opinion also intimated that Branion might lack cause for his default if he had known or readily could have known of the ex parte contacts near the time of their occurrence.

**18.** It is worth noting that the resolution of Homer's suppression motions did involve credibility determinations that are effectively unreviewable on appeal. Thus a corrupt judge, intent on retribution for a refusal to make a payoff, might have maliciously used the shield of credibility evaluations to reject what might otherwise have been meritorious arguments leading to the suppression of evidence or statements.

can be averted because Homer has not prevailed under the first *Wainwright* component. This opinion rests on its determination that Homer has failed in his showing of cause and has not overcome his earlier waiver of the bribe solicitation claim.

### Bruton Violation Claim

At long last this opinion can turn to the merits of Homer's claims. His *Bruton* Violation Claim stems from the joint trial of Homer and Michael, Michael's decision not to testify and the introduction of statements by Michael that contained material incriminating Homer.

According to the testimony at trial, Michael gave numerous statements to the police and prosecutors after his arrest. Homer challenges, however, the admission of only one of those statements: Officer Giovannelli's testimony that at 8:30 a.m.[19] on Friday, November 22 (T.323):

Michael Hanrahan informed us that on the night of the 20th he overheard an argument between his father and mother. He stated that he, then heard a crash and that he went down to the basement area of the home—allegedly where the argument was taking place and there saw his mother lying on the floor and his father standing over her with blood on him, and he heard his father say, oh, my God, what have I done.[20]

Homer contends the admission of that statement, attributed to his nontestifying codefendant, deprived him of his right to confront the witnesses against him as guaranteed by the Sixth Amendment.

*Bruton* forms the foundation of Homer's argument. There the admission of a confession made by nontestifying defendant A and containing material inculpating defendant B was held violative of B's rights under the Confrontation Clause (391 U.S. at 126, 88 S.Ct. at 1622–23). *Bruton, id.* at 137, 88 S.Ct. at 1628–29 held a jury instruction that the statement was applicable only to A was insufficient to prevent the violation of B's right to confront and cross-examine the witnesses against him.

Until last year it was unclear whether the *Bruton* holding applied to the situation of so-called "interlocking confessions," where there is not only a confession by nontestifying defendant A but also a statement to the authorities by defendant B that echoes, in whole or in part, A's statement. *Rosochacki*, 41 Ill.2d at 494, 244 N.E.2d at 142 had declined to apply *Bruton* to a situation involving interlocking confessions. Understandably the Appellate Court dealing with Homer's appeal relied on *Rosochacki* in concluding that Homer's rights had not been violated by the introduction of Michael's statements to Giovannelli (64 Ill. App.3d at 214–15, 20 Ill.Dec. at 871–72, 380 N.E.2d at 1080–81).[21]

In *Parker v. Randolph*, 442 U.S. 62, 74–75, 99 S.Ct. 2132, 2140, 60 L.Ed.2d 713 (1979) a Supreme Court plurality endorsed the interlocking confessions exception to *Bruton*. But last year *Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 1718, 95 L.Ed. 2d 162 (1987) rejected that approach and in its place espoused the concurring view of Justice Blackmun in *Parker*, under which *Bruton* is violated despite the interlocking confession. Under *Cruz, id.* 107 S.Ct. at 1719 the proper inquiry is whether the Confrontation Clause violation is harmless given the defendant's own admissions.

■ Nevertheless Thieret persists in urging Homer's confrontation rights were not violated. He insists Michael's statement was properly admitted because it was supported by "sufficient indicia of reliabili-

---

**19.** Though witnesses disagreed on the exact time Michael made the statement, for simplicity this opinion will refer to it as the "8:30 a.m. statement."

**20.** [Footnote by this Court] It was the admission of this testimony to which Homer's attorney consented on the condition that the jury was instructed that it could not be used as evidence against Homer.

**21.** What the Appellate Court was actually called on to decide was whether Homer's rights were violated by the trial court's refusal to sever his case from Michael's. However, Homer based his severance contention on the purported *Bruton* violation. That position was rejected under the *Rosochacki* rationale (*id.*).

ty," invoking the statement of that principle in *Lee v. Illinois*, 476 U.S. 530, 543–44, 106 S.Ct. 2056, 2063–64, 90 L.Ed.2d 514 (1986). *Cruz*, 107 S.Ct. at 1718–19 reaffirmed the viability of the *Lee* basis for admissibility without transgressing a defendant's Confrontation Clause rights.

But Thieret has not proffered even a colorable showing that Michael's statement to Giovannelli was reliable. He says Michael's statements were "highly reliable" because (R.Mem. II–3):

Michael spoke freely to the police. He had absolutely no motive to falsify his statements. In addition, Michael's statements were corroborated by [Homer's].

There are two fundamental problems with that characterization of Michael's 8:30 a.m. statement:

1. That statement clearly inculpates Homer and would tend to exculpate Michael. Michael may have had no motive to falsify his later statements that he had struck his mother, but this earlier version could well be the product of a desire to shift blame to his father.

2. Michael's statement is also not corroborated by the version of events that Homer gave during his interrogation. In an obvious sense, the existence of substantial parallels between Homer's and Michael's statements in other areas does not support the reliability of Michael's statements at points where they diverge from Homer's—indeed, the potential for a jury's giving the statement greater weight (and hence of possible prejudice to Homer) is enhanced by the other parallels.

As to this last point *Lee*, 476 U.S. at 545, 106 S.Ct. at 2064 (citation to *Parker* omitted) had this to say:

Obviously, when codefendants' confessions are identical in all material respects, the likelihood that they are accurate is significantly increased. But a confession is not necessarily rendered reliable simply because some of the facts it contains "interlock" with the facts in the defendant's statement.... The true danger inherent in this type of hearsay is, in fact, its selective reliability. As we

have consistently recognized, a codefendant's confession is presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another. If those portions of the codefendant's purportedly "interlocking" statement which bear to any significant degree on the defendant's participation in the crime are not thoroughly substantiated by the defendant's own confession, the admission of the statement poses too serious a threat to the accuracy of the verdict to be countenanced by the Sixth Amendment. In other words, when the discrepancies between the statements are not insignificant, the codefendant's confession may not be admitted.

Thieret offers none of the indicia of reliability that courts accept as a substitute for confrontation, such as prior testimony under oath with opportunities for cross-examination (see *United States ex rel. Bell v. Director, Department of Corrections*, 847 F.2d 399, 400 (7th Cir.1988)).

In consequence Michael's challenged statement cannot be viewed as sufficiently reliable to qualify under *Lee*. This Court holds its admission violated Homer's Sixth Amendment rights under *Bruton*.

■ But a *Bruton* violation does not of itself assure Homer habeas relief. What must also appear is that the violation involving Michael's statement was *harmful* rather than *harmless* error, the focus required by *Cruz*. *United States ex rel. Sanders v. Lane*, 835 F.2d 1204, 1206 (7th Cir.1987) (citation omitted) has defined the appropriate inquiry this way (adapted to this case):

The admission of [Michael's] statement is harmless only if there is no reasonable possibility that [Michael's] statement might have contributed to [Homer's] conviction.... Thus, unless we are convinced beyond a reasonable doubt that the jury would have convicted [Homer] absent [Michael's] statement we must [grant] his habeas corpus petition.

To that end this Court has reviewed the nearly–1,800–page transcript of Homer's trial. It concludes the admission of Michael's statement was in fact harmless beyond a reasonable doubt.

Homer's memorandum addressing the harmless error issue repeatedly emphasizes there were seven separate references at trial to Michael's statement to Officer Giovannelli (P.Mem. IV–3). Homer stresses the dramatic impact of the statement (*id.* at 8) (emphasis in original):

> It is also important to recognize that the jury not only heard the words "Oh, my God, what have I done?" attributed to [Homer] by Michael Hanrahan *seven* times, but they were also provided with a powerful and disturbing mental image of [Homer] standing or kneeling over his wife with blood on him when he said the words.

Certainly the statement is very different from the other versions heard by the jury in which Michael was the one who struck Marian or, as in Homer's testimony at trial, Marian hit her head on a post in a struggle with Homer after *Marian* pulled a knife on Homer for no reason (T. 1028–31). Homer also asserts the central importance of the statement in Michael's strategy at trial of shifting the entire responsibility onto Homer (P.Mem. III–5, 7).

Homer's difficulty, as is so often the case with advocacy by able counsel, is that the reality does not match the lawyer's argument. Instead a review of the trial transcript demonstrates the minor role played by the challenged statement. Neither the prosecutor nor Michael's counsel Suffredin placed any emphasis on Michael's statement to Giovannelli, either as suggesting Homer was the one who struck Marian or as evidencing intentional or reckless conduct on Homer's part. In their closing statements, both Suffredin for Michael and Pappas for the state discounted that asserted version of the events. To understand the minor importance of this one statement by Michael, it is useful to set out briefly the seven times (as counted by Homer) the statement was referred to at trial.

It first came before the jury during Suffredin's cross-examination of Giovannelli, when the latter related Michael's 8:30 a.m. statement as already quoted in the text (T. 323). That brief testimony was the sole extent of the relevant discussion while Giovannelli was on the stand. Then the next witness, Officer Gerald Sheehan, testified he too heard Michael's statement (T. 369):

> Michael indicated in the 8:20 statement that he was upstairs in the livingroom, his father, Homer, was down in the family room in the basement with his mother. He heard an argument going on, he heard a loud crash, then he went downstairs and saw his father kneeling over his mother with blood on him.[22]

Next, during Homer's cross-examination he was asked what he had said to Michael at the point when Marian had hit her head and Homer then injected her with the drug Sparine to calm her down (T. 1174–75):[23]

> Q. And what did you say to Michael and what did he say to you?
>
> A. I said something like my God what happened or why did this have to happen or something to that effect. I was scared.
>
> A. Or my God, what did I do?
>
> A. I could have said that, yes. The exact words I'm not sure of. I was panicked at that point.
>
> Q. She was going to the filing cabinet, she fell down, she bumped herself and she got up with the knife and she came at you with the knife and she ran around the post swinging the knife and when Michael came down you said my God, what did I do?
>
> MR. DOWNS: Objection.
>
> MR. SUFFREDIN: Objection.
>
> MR. DOWNS: It is totally out of context.

---

**22.** [Footnote by this Court] Contrary to Homer's memorandum (P. Mem. IV–7), Sheehan did not testify to Michael's having quoted Homer as saying, "Oh my God. . . ."

**23.** In an illustration of somewhat dubious arithmetic, this exchange is counted by Homer as two separate references to the challenged statement.

THE COURT: I will sustain the objection.

BY MR. SUBOR [sic]:

Q. Well, this is what you testified to on direct examination yesterday, that you said to Michael, my God, what did I do, is that right?

MR. DOWNS: Objection, that is not the testimony.

THE COURT: Well, if he testified to that on direct I'm sure the Jury has heard it so we don't have to repeat it, Mr. Subor [sic].

ASA Mark Zubor ("Zubor") (misspelled by the court reporter as "Subor") did misquote Homer's direct examination testimony about what he had said to Michael on returning to the basement with ice cubes and towels after Marian had hit her head (T. 1034) (emphasis added):

Well, as near as I can recall, I said, "My God, what happened, what did *you* do?" Or something to that effect.

What is most notable about that cross-examination by Zubor, though, is that Homer *admitted* he could have said "Oh my God, what did I do?" while in the basement that evening (T. 1175).

There was no other trial testimony about the challenged statement by Michael, or about Homer's account of what might have been the source of that statement. There were, however, three references to Michael's statement during the closing arguments—and those references most clearly demonstrate the minor role played by the statement, as contrasted with the stress Homer now seeks to place on it.

First, during the course of the prosecution's main closing argument Zubor summarized the trial testimony, including a summary of Giovannelli's testimony without special emphasis (T. 1600). On Michael's behalf Suffredin also made but a single reference to the statement (T. 1679). He did so in an offhand way, in the context of his real argument that even though the police questioned Michael for more than 45 minutes at several times on the morning of November 22, they testified to just 30 seconds or less on what Michael had said (T. 1679–80). Thus Suffredin was arguing the

inaccuracy of the police testimony about Michael's statements—he did not advance the 8:30 a.m. statement as evidence the jury should view as incriminating Homer.

Finally prosecutor Pappas' closing rebuttal referred to Michael's statement (T. 1710), but in a manner urging its untrustworthiness rather than its believability. Pappas presented the progression of Michael's statements to the police and ASAs from Friday morning through Saturday morning (T. 1709–11), suggesting that the 8:30 a.m. statement was an understandable effort to shift the blame to Homer (who was not yet in custody) while conforming the statement to evidence Michael suspected the police had already discovered. Pappas' theory of the case was that Michael's 8:30 a.m. statement was a lie, an attempt to evade responsibility, but that his later statement early Saturday morning, admitting he had struck Marian, was the accurate version.

Thus the lawyers' arguments were not at all such as to focus the jury's thinking in the manner Homer now urges. Both in terms of its minimal emphasis and the nature of that emphasis, Homer's purported "Oh my God ..." statement to Michael was not presented to the jury as a significant factor in Homer's guilt. To be sure, it is conceivable that a piece of evidence may be so inherently damaging that even if left wholly unmentioned by counsel it may taint a conviction. This opinion will therefore go on to examine whether the jury would have found the state's case "significantly less persuasive" without the *Bruton*-violative statement by Michael (see *Schneble v. Florida*, 405 U.S. 427, 432, 92 S.Ct. 1056, 1060, 31 L.Ed.2d 340 (1972)).

If anything, Michael's 8:30 a.m. statement *detracted* from the persuasiveness of the state's case by presenting to the jury a version of the relevant events by Michael quite different from the one the state was arguing as the accurate version. Inclusion of the 8:30 a.m. statement served to show Michael's inconsistency and tended to undercut Michael's later statements detailing a conspiracy between Michael and Homer to extort property from Marian. Once

again it was that later version whose accuracy and veracity the prosecution advocated—*not* the earlier statement given to Giovannelli. And there are other factors supporting the harmlessness of the *Bruton* error in addition to the minimal emphasis that Michael's 8:30 a.m. statement received at trial:

1. That statement concerned the cause of the initial injury to Marian, while the unrebutted evidence at trial identified the cause of death as acute morphine intoxication (T. 546, 568). Pathologist Choi also testified to the numerous puncture wounds found on Marian's buttocks (T. 527). Choi concluded the bruises found on the victim, including two to her head, were only contributing factors in her death (T. 573, 578). Michael's 8:30 a.m. statement shed no light on the source of the drugs that caused his mother's death and thus would have been of less importance to the jury in assigning responsibility for Marian's death.

2. It also was of minimal legal significance whether Homer or Michael had struck Marian. Whichever committed the physical act under any version the jury heard, Homer would bear legal responsibility. It will be remembered that the jury found Homer and Michael guilty of conspiracy. Under basic criminal law principles, each conspirator is chargeable with the acts of his co-conspirator during the course and in furtherance of the intended crime (see *People v. Terry*, 99 Ill.2d 508, 515, 77 Ill.Dec. 442, 445, 460 N.E.2d 746, 749 (1984)).

Nor is any different conclusion called for by the fact that Homer and not Michael was convicted of Marian's murder. Homer seeks to emphasize Michael's statement as the one piece of evidence that incriminated Homer rather than Michael and as accounting for the jury's different treatment of the two defendants (P.Mem. IV–5):

It could be argued that but for Michael's damning "Oh, my God, what have I done?" statement the prosecution's case against [Homer] would have been no stronger than its case was against Michael.

In support of that line of thought, Homer's counsel points out the jury found both Homer and Michael guilty of aggravated kidnapping, the predicate felony for the trial court's felony-murder instruction to the jury. Yet the jury acquitted Michael of murder, which implies that Homer was not convicted of murder under a felony-murder theory (P.Mem. IV–5). Homer then suggests that his murder conviction must have been based on one of the three alternate theories given to the jury:

1. He intended to kill or do great bodily harm to Marian.

2. He knew his acts would cause death or great bodily harm.

3. Those acts created a strong probability of such dire results.

Where Homer's argument collapses, however, is that there were ample reasons for the jury to reach different conclusions as to the two defendants under the stated murder theories other than the challenged statement by Michael. All the trial evidence showed Homer, rather than Michael, was the one with knowledge of drugs from his educational background in the sciences and his previous employment as a pharmaceuticals salesman. It was also well within the jury's purview to conclude the injection of drugs into Marian was not within the scope of the conspiracy between Homer and Michael, but was Homer's independent action in response to an unintended injury to Marian. Indeed, the jury was certainly entitled to credit Homer's own testimony that Michael had no involvement in the application of drugs to Marian and that Michael had repeatedly urged Homer to seek medical assistance for her. Any or all those reasons plausibly account for the jury's verdict. There is not the slightest indication that Michael's purported statement to Giovannelli could have made a difference in (let alone its having been the source of) the jury's decision to convict Homer of his wife's murder.

Homer has made a valiant effort to make the most out of an error by the trial court (committed with the participation of Homer's trial counsel) to try the two defend-

ants jointly and then permit the introduction of Michael's statements implicating Homer. But based on the *Cruz*-dictated examination of the effect of that error, this Court concludes there is no reasonable possibility that the challenged statement contributed to Homer's conviction. Consequently the *Bruton* error was harmless and does not warrant the grant of habeas relief.

### Ineffective Assistance of Trial and Appellate Counsel Claims

Having found the violation of Homer's *Bruton* rights harmless, this opinion can quickly dispose of most of Homer's non-waived claims as to the ineffectiveness of his trial and appellate counsel. They will be dealt with in turn.

■ As for Downs' failure to object to the admission of Michael's statement to Giovannelli, even on the assumption that counsel's performance was constitutionally deficient Homer still cannot demonstrate he was prejudiced by Downs' action or inaction—the second prong required by *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. As *Strickland, id.* at 691, 104 S.Ct. at 2066 explained:

> An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.

Because the *Bruton* error had no effect on the outcome, Downs' performance did not violate Homer's Sixth Amendment rights.[24]

It is equally true that Homer cannot claim a Sixth Amendment violation based on appellate counsel Suffredin's failure to challenge Downs' performance over the *Bruton* issue. Here the analysis is slightly different, because Homer adds the charge that Suffredin was doubly burdened by a conflict of interest in representing Homer:

1. Suffredin was counsel for both Homer and Michael on their joint direct appeal (a matter that had several purported consequences).

2. In representing Michael at trial Suffredin had, in Homer's view, caused some of the damage (eliciting Michael's statement to Giovannelli) that he was now asked to undo on Homer's appeal.

On Michael's second habeas petition this Court dealt with the issue of ineffective assistance of counsel burdened with an alleged conflict of interest. *Hanrahan II*, 591 F.Supp. at 254–55 (footnotes omitted) announced standards applicable to a trial counsel's conflict:

> To establish a violation of the Sixth Amendment caused by his trial counsel's conflict of interest, a defendant who raised no objection at trial must demonstrate "an actual conflict of interest adversely affected his lawyer's performance." *Strickland* [466 U.S. at 692, 104 S.Ct. at 2067], quoting from *Cuyler v. Sullivan,* 446 U.S. 335, 348 [100 S.Ct. 1708, 1718, 64 L.Ed.2d 333] (1980). See *Wilson v. Morris,* 724 F.2d 591, 594 (7th Cir.1984) (en banc). Once such a conflict-caused adverse effect is shown, courts do not inquire (as they do in cases in which incompetence of counsel is alleged) whether that effect was likely to have led to a different result in the criminal proceeding.

That formulation requires a twofold showing (*id.* at 256):

> 1. an actual, as opposed to only a potential, conflict of interest
>
> 2. that has in fact adversely affected counsel's performance.

With a limited exception mentioned later, the same principles will be applied to the performance by appellate counsel Suffredin. Analysis shows Homer has not made the necessary showing.

As his main claim, Homer attacks Suffredin's failure to raise on appeal Downs' lack of objection to the admission of Michael's statement against Homer. First, it is unclear whether an actual conflict infected Suffredin's potential advocacy of this argument on Homer's behalf. Although Mi-

---

**24.** It will be recalled that this opinion has earlier determined that Homer's other claims ad-

dressed to Downs' actions have been waived.

chael might arguably have wanted the statement presented at trial to the jury,[25] no interest advanced on Michael's behalf on appeal conflicted in any way with Homer's efforts on the same appeal to question Downs' handling of the issue at trial. It is true that Suffredin would have had to make the contention on Homer's behalf in the face of his own lack of objection to the statement's admission (when he was acting as Michael's trial counsel). But that is not a critical factor, for Suffredin would not have been attacking his own competence by now asserting in Homer's appeal that Homer had been prejudiced by Suffredin's involvement in getting all of Michael's statements before the jury.

All this, however—the question whether Suffredin was actually operating under a conflict of interest on appeal—becomes a moot issue. Homer must lose because he has not satisfied the second element: demonstrating an adverse effect on Suffredin's performance.

This opinion's earlier discussion about the harmlessness of Michael's statement being introduced at trial also forecloses any contention of Suffredin's deficiency in having failed to present the same issue to the Appellate Court in the context of Downs' effectiveness at trial. Even if Suffredin is viewed as operating under a conflict of interest, it caused no legally cognizable adverse effect on his performance if it merely induced him to forgo a meritless argument.

■ If this no-prejudice analytic approach were applied in the context of a trial counsel conflict of interest, it would run afoul of the principles identified in the excerpt from *Hanrahan II* quoted earlier in this section. Trial handling involves so many facets that an inquiry into whether an actual conflict of interest really made (or was likely to have made) a difference in result would be an extraordinarily difficult task. *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067 explains the reason for a prophylactic rule under those circumstances:

> Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests.

But here the only asserted effect on Suffredin's performance was his failure to make a single bootless argument in an appellate brief or oral argument. Whether that is viewed as not having "adversely affected [Homer's] lawyer's performance" (*Cuyler,* 446 U.S. at 348, 100 S.Ct. at 1718) or as otherwise showing the absence of any real (as contrasted with presumed) prejudice to Homer, there is clearly no reason to take the nonsensical action of reversing an appellate decision for counsel's failure to present an argument that would have been unsuccessful anyway. As this Court said in response to one of Michael's arguments in *Hanrahan III,* 664 F.Supp. at 1190:

> And it would be a contradiction in terms to find a lawyer incompetent for not having tendered an empty argument to the Appellate Court.

As to the first branch of Homer's argument, then, clearly he has not shown Suffredin provided constitutionally ineffective assistance by failing to raise on appeal the issue of Downs' trial performance. As noted earlier, Homer has also challenged other aspects of Suffredin's performance on appeal, and those require separate treatment.

■ First, Homer claims Suffredin was ineffective for failing to raise on appeal that Homer's Fourth Amendment rights were violated when the trunk of his car was opened without a warrant (Petition at 12; P.Mem. I–11). What Suffredin did raise on behalf of both Homer and Michael, as summarized by the Appellate Court[26]

---

**25.** This premise is subject to considerable doubt. As this opinion reflects in the section captioned "*Bruton* Violation Claim," Suffredin made the most limited reference to that statement on Michael's behalf—and then not to urge the reliability of that statement, but rather the unreliability of Giovannelli's testimony in recounting the making of such a statement. Thus neither Michael nor Suffredin evinced any affirmative stake in the 8:30 a.m. statement at all.

**26.** Unfortunately this Court was not furnished the parties' briefs from Homer's and Michael's direct appeal. However, there is no contention that the Appellate Court's description was an inaccurate summary of Suffredin's argument.

(64 Ill.App.3d at 213, 20 Ill.Dec. at 871, 380 N.E.2d at 1080), was this:

> On appeal, defendants first argue that the trial court erred in denying their motion to quash the arrests and in denying their motion to suppress the evidence and statements obtained therefrom.

Homer asserts (Petition at 12) that (1) any such argument was doomed to failure as to *his* rights because he lacked standing to claim prejudice stemming from a violation of Michael's rights (see *Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978)) and (2) Suffredin ignored the car trunk issue as an independent Fourth Amendment violation.

*Gray v. Greer*, 800 F.2d 644, 646 (7th Cir.1986) offers the appropriate standard for the review of Homer's omitted argument claim:

> When a claim of ineffective assistance of counsel is based on failure to raise viable issues, the district court must examine the trial court record to determine whether appellate counsel failed to present significant and obvious issues on appeal. Significant issues which could have been raised should then be compared to those which were raised. Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.

Even a cursory review of the record shows Suffredin's decision to omit the car trunk issue could not even approach that standard and was not open to collateral attack.

During a multi-day suppression hearing, one of the issues considered was whether the police had acted reasonably in the warrantless search of Homer's car trunk. Several police officers testified that when Homer was arrested inside the home of his girlfriend Stiles, his car could be seen in the adjoining garage through the open connecting door (R. 197). At that time the police were aware of the statement by Michael, who was already in police custody, that Marian had been placed in the car trunk and that he believed he heard her moan when that was done (R. 97–98). Accordingly the police telephoned ASA Pappas, who instructed them to open the car trunk to see if Marian was inside and in need of medical assistance (R. 198).

Counsel's suppression hearing arguments over the admission of the car trunk evidence centered on whether exigent circumstances justified the opening of the trunk without a warrant. Judge Olson ruled (R. 631):

> Here with some evidence offered that the victim was still alive when placed in the trunk, not only was the search of that trunk reasonable and legal, but anything less than that search, in my opinion, would have been a failure of the State to perform certainly a basic fundamental duty.

That holding plainly followed the well-recognized exigent circumstances exception to the warrant requirement, which "recognizes that 'warrantless entry by criminal law enforcement officials may be legal when there is a compelling need for official action and no time to secure a warrant' " (*United States v. Rivera*, 825 F.2d 152, 156 (7th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 494, 98 L.Ed.2d 492 (1987), quoting *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949–50, 56 L.Ed.2d 486 (1978); accord, *People v. Free*, 94 Ill.2d 378, 395, 69 Ill.Dec. 1, 9, 447 N.E.2d 218, 226, *cert. denied,* 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983)).

Suffredin's decision not to include that particular Fourth Amendment argument on appeal cannot be second-guessed from this vantage point. At best the issue was a long shot (if even that), and Suffredin was entitled to put Homer's appellate eggs in other baskets. In reviewing this issue on Homer's post-conviction petition, the Illinois Appellate Court concluded (132 Ill. App.3d at 641–42, 87 Ill.Dec. at 894, 478 N.E.2d at 33):

> In the case at bar, there is absolutely no indication that appellate counsel was mistaken in his decision to raise certain issues on appeal and not raise other issues.

This Court is constrained to agree. Suffredin did not violate Homer's Sixth Amendment rights by failing to challenge on appeal the search of the car trunk.

Homer's final attack on Suffredin is simply this (P. Mem. I–11):

> Homer Hanrahan also alleges that Mr. Suffredin refused to raise certain issues on appeal which he believed were critical to the success of the appeal.

Nowhere does Homer provide any information about those potential arguments. That creates no basis for an adverse evaluation of Suffredin's performance. Homer's catch all challenge must also be dismissed.

### Pappas-as-Prosecutor Claim

 Homer's final claim concerns his Sixth Amendment confrontation rights and the interplay between ASA Pappas' pretrial involvement with Homer and Michael and his prosecution of the case. Homer contends Pappas became an unsworn and uncross-examined witness against him because (1) Pappas was involved in crucial events during the investigation of the case and (2) his constant presence before the jury bolstered the state's case and enhanced the credibility of the state's witnesses (Petition at 15–17; P.Mem. I–18–21).

This Court dismissed the identical claim in Michael's third habeas petition for multiple reasons. In part those reasons were procedural in nature and are wholly inapplicable to the present posture of Homer's Petition (see the "Pappas-as-Prosecutor Claim" subsection of the "Waiver" section of this opinion). But *Hanrahan III*, 664 F.Supp. at 1193 also concluded that Michael had suffered no prejudice from the claimed Confrontation Clause violation, in light of his failure to cast any doubt on the Appellate Court's conclusion that Pappas' investigatory role was "relatively minor" and that Pappas had mentioned his involvement only once to the jury, to be met with an immediate admonition from the trial judge. Here, in contrast, Homer has tendered the entire state court record for review, so some further discussion of the prejudice-no-prejudice issue is in order.

Pappas' participation in the investigatory and pretrial phases of the case is not in dispute. He was one of the ASAs called to the Niles police station on November 22 after the Hanrahans were arrested. He was the one who directed the police to open Homer's car trunk, and he gave pathologist Choi a history of the case before Choi performed the autopsy on Marian. He also testified during the suppression hearing before Judge Olson. But none of those activities was put in issue before the jury during the trial.

As our Court of Appeals said regarding a prosecutor's suppression hearing testimony in *United States v. Johnston*, 690 F.2d 638, 646 (7th Cir.1982) (en banc):

> As a general rule, the government prosecutor is not to be automatically disqualified as a witness or as trial advocate after testifying at a pretrial suppression hearing, but testifying and continuation as counsel shall be subject to the sound discretion of the trial judge exercised in accordance with the general principles discussed in this opinion.

Plainly no predicate for a Confrontation Clause violation arises out of Pappas' activities that were never brought to the jury's attention and hence could not have made Pappas a "witness" (even in the constructive sense) against Homer at trial.

Only one aspect of Pappas' pretrial conduct was commented on to the jury: his presence during ASA DiVito's questioning of both Michael and Homer during the early morning of November 23. But Pappas never took the stand to speak to what took place during that questioning.

Instead DiVito testified at length to the statements made by both Michael and Homer during those early morning sessions. It was to DiVito that Michael purportedly admitted the conspiracy to hold Marian hostage (T. 754–55) and gave the most detailed description of the events of November 20 and 21 (T. 755–61). DiVito also testified that Homer told him the location of various items of physical evidence, admitted injecting Marian with Sparine and also said Michael had struck Marian in the head with a gun (T. 768–72).

In substantial part the defense strategy for both Michael and Homer involved attacks on the veracity of DiVito's testimony about defendants' statements. In closing argument on Homer's behalf, Downs em-

phasized that DiVito interrogated Homer and Michael for several hours without taking a note except for the one word "Sparine" while speaking to Homer (T. 1643–45). Downs sought to have the jury reject the reliability of the asserted statements.[27] On Michael's behalf, Suffredin's closing argument also attacked DiVito's credibility (T. 1663–68). He emphasized how DiVito, an experienced prosecutor, took all the statements without notes and without the use of a court reporter (*id.*). He directly challenged the believability of DiVito's testimony and his memorandum written several hours after the interrogation sessions (T. 1668).

Even though Pappas himself did not testify to his involvement and observations, Homer argues Pappas' participation in the trial served as implicit testimony to the jury that DiVito and the state's case were to be believed (P. Mem. II–12):

> [T]he jurors had reason to believe that Pappas' pretrial activities were proper or otherwise he would not be the prosecutor at trial.

Homer thus tries to equate Pappas' situation with the familiar advocate-witness rule dealt with at length by our Court of Appeals (in the different context mentioned earlier) in *Johnston*, 690 F.2d at 642–46.

Unquestionably the jury was aware of Pappas' having been present during DiVito's questioning of Homer and Michael. Although Pappas personally mentioned his pretrial involvement only once (T. 34), his name came up a few times during the testimony of witnesses:

1. DiVito testified Pappas was present when DiVito spoke to Michael (T. 751) and to Homer (T. 767).

2. On cross-examination by Suffredin, DiVito testified (a) Pappas was present during all but very short periods of Michael's questioning and (b) Pappas participated in the discussion, although DiVito "carried on the brunt of the discussion and questioning" (T. 812).

3. Pappas' name also came up briefly during Homer's testimony, although Homer said Pappas was not in the room when Homer gave his statement to DiVito (T. 1293–94).

During closing arguments Pappas was also referred to briefly, but this time in pre-interview rather than interview terms. Downs mentioned that DiVito had conferred with Pappas before questioning the Hanrahans (T. 1644). Suffredin reiterated that in his closing (T. 1662). ASA Zubor made *no* reference to Pappas in the prosecution's initial closing statement. Nor did Pappas' rebuttal closing statement, in which he emphasized DiVito's credibility at length (T. 1692–93). Pappas argued as to DiVito (T. 1692):

> Ladies and gentlemen, you don't become a deputy state's attorney by trickery, and by deceit.

Later in his argument he repeated the lack of trickery by DiVito (T. 1702).

Thus the total references to Pappas' presence at the DiVito interviews were a bit greater than suggested by the Appellate Court's characterization of his having given only one mention to "his involvement in the case." In that respect, although Section 2254(d)(8) ascribes presumptive correctness to factual findings by a state appellate court as well as a state trial court (*Sumner v. Mata*, 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981)), of course that presumption is not conclusive. What the Appellate Court said was entirely accurate, but the state court record shows it was not quite the whole story (and this is not a situation of resolving matters of credibility or other factual disputes, as to which the state courts would have the last word).

All the same, the few added references to Pappas described above simply do not serve the purpose for which Homer's present counsel now seeks to use them (importantly, both closing argument references to Pappas' having conferred with DiVito *before* the questioning belie the notion that mentioning Pappas amounted to vouching for DiVito's version of what happened *during* the questioning). Finally, to

---

27. In addition, Homer had claimed during his testimony that he spoke to DiVito only because

DiVito had led him to believe he was an attorney appointed to represent him—not an ASA.

concentrate in a single post-hoc summary the several brief mentions, occurring as they did in the course of this extended trial and closing argument, represents a distortion of the real picture before the jury.

But most importantly, Homer asks this Court to take an impermissible leap from those few references to the conclusion that Pappas was the functional equivalent of a witness—that the situation is just as though he had taken the stand and sworn to the same things DiVito did, but without the opportunity for Homer's counsel to cross examine Pappas. That misstates the advocate-witness rule, it misstates the reasons underlying that rule (including the Code of Professional Responsibility provisions embodying the rule) and it misstates the common sense of the situation presented to the jury that convicted Homer.

What the advocate-witness rule seeks to prevent is the situation in which the lawyer (either the counsel in a civil case or the prosecutor in a criminal case) testifies to substantive matters in the case, then argues his credibility (as well as that of other witnesses); see *People v. Janes*, 138 Ill. App.3d 558, 567–71, 93 Ill.Dec. 216, 222–24, 486 N.E.2d 317, 323–25 (2d Dist. 1985); *People v. Ortiz*, 54 N.Y.2d 288, 445 N.Y.S. 2d 116, 429 N.E.2d 794 (1981). Every Illinois state court jury is instructed that giving evidence is not the function of the lawyer. IPI Criminal Instruction 1.03 reads:

> Opening statements are made by the attorneys to acquaint you with the facts they expect to prove. Closing arguments are made by the attorneys to discuss the facts and circumstances in the case, and should be confined to the evidence and to reasonable inferences to be drawn from the evidence. Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded.[28]

And *this* jury was told that more than once. When Judge Collins explained to the jury the fact they were about to hear the lawyers' closing arguments, the last thing he said before introducing prosecutor Zubor was this (T. 1592):

> Again the jurors are reminded that what the lawyers say is not evidence.

Then immediately after prosecutor Pappas concluded the rebuttal closing argument, Judge Collins restated the operative principles in the identical classic IPI form quoted above (T. 1710).

When a lawyer is arguing that his own testimony is truthful, the jury's function is potentially impaired ("How can my recollection of what he testified to be better than his own?"). There is also the danger of a spillover of that notion to the testimony of other witnesses ("If he's willing to go on the line by swearing to disputed matters under oath, why shouldn't I believe what his argument has to say about the other witnesses too?"). Code of Professional Responsibility DR 5–101(B) and 5–102 understandably adopt a prophylactic rule that disqualifies the lawyer-witness, and that is all our Court of Appeals prescribed in *Johnston* (see the language quoted earlier).

But, urges Homer's present counsel, the jury that knows Pappas was present at the interviews will tend to believe DiVito (apparently on a "Would one State's Attorney call another to the stand if he didn't believe his testimony?" premise), so that is just as though Pappas were testifying himself. That scenario is extraordinarily tenuous. Indeed, common sense would suggest precisely an opposite line of reasoning by a jury of laymen.

Remember that Pappas' acting as prosecutor in the case left the prosecution totally reliant on DiVito for testimony as to defendants' statements (Pappas was squarely disqualified from buttressing DiVito's testimony under the advocate-witness rule). DiVito, the real (not a shadow) witness, was fully cross-examined. And defense

---

**28.** That same message is given to every federal criminal jury in this Circuit, under Federal Criminal Jury Instruction 1.05 prescribed by the Seventh Circuit's Committee on such instructions.

counsel's closing arguments leveled their heavy guns at DiVito's testimony and what they labeled his lack of credibility.

Juries are not instructed in the arcane mysteries of the advocate-witness rule, and that rule is surely not a matter of common experience (lawyer-disqualification motions before this Court and in the reported cases reveal that all too many *lawyers* are unaware of the demands of the Disciplinary Rules that incorporate and implement the advocate-witness rule). It is far more likely for a jury, confronted with a challenge to DiVito's version of the interviews and in doubt as to his credibility, to reason:

> If DiVito is telling the truth about what Homer (and Michael) said, why didn't Pappas—who was there—get on the stand to support DiVito's story? [29]

Thus the jury's knowledge of Pappas being present during Homer's statement to DiVito (though it will be recalled Homer testified he was *not* there) would more logically create a question as to, rather than reinforcing, DiVito's reliability.

In sum, Homer's present counsel has produced an imaginative argument. But it is only that: imagination. Pappas cannot fairly be viewed as the unsworn witness, the lack of whose cross-examination violated Homer's Confrontation Clause rights.

**29.** Juries are always instructed a *defendant* need not take the stand, and no adverse inferences are to be drawn from his or her failure to do so. No such instruction is ever given (or was given

### Conclusion

There is no need for any evidentiary hearing here. Based on the record, this Court resolves Homer's present claims this way:

1. Homer has waived, by failing to present matters to the appropriate state court:

(a) his ineffective assistance of trial counsel claims, other than his claim addressed to Downs' failure to assert the purported *Bruton* violation, and

(b) his claim based on an alleged bribery solicitation by Judge Olson.

2. These claims are dismissed on the merits:

(a) Homer's *Bruton* violations claim (any error in that respect was harmless);

(b) Homer's remaining ineffective assistance of trial counsel claims;

(c) Homer's ineffective assistance of appellate counsel claims; and

(d) Homer's Confrontation Clause claim based on the false characterization of prosecutor Pappas as an unsworn and un-cross-examined "witness."

Homer's Petition is dismissed in its entirety.

in this case) as to other witnesses.

At approximately midnight on November 22, 1974, Mary Ellen Hanrahan, age 16, went to the Niles Police Station to express worry about her mother, Marian Hanrahan. She related that when she arrived home at 9:30 p. m. on November 20, she was met at the door by her father, defendant Homer Hanrahan. She indicated that it was unusual for him to be there since divorce proceedings were pending between him and her mother and further, because he was no longer living at the home. She noticed blood on his arm and chest which he explained was the result of a fight between the deceased and her brother, defendant Michael, but that everything was now settled.

Defendant Homer instructed her to go upstairs to her room, which she did. Once there, however, she listened at an air vent that led to the basement. She stated that she heard the deceased scream and that she heard her mother moan, "It hurts, it hurts."

A short time later, Mary Ellen heard her uncle, Jerry Wallenberg, bringing her brother Steve home from a birthday party. Defendant Michael opened the door for them. Mary Ellen stated that Michael was wearing only his undershorts and that they too, had blood on them. When Mary Ellen inquired what was wrong, defendant Michael told her that the deceased threatened him and that he hit her in the face. He further informed her that she could not see her because defendant Homer was in the basement talking to her. Thereafter Mary Ellen returned to her room and fell asleep.

The next morning, at approximately 7 a. m., Mary Ellen was awakened by the sound of her brother, defendant Michael Hanrahan, leaving for school. A short time later, defendant Homer Hanrahan came into her room to tell her to get ready for school. When Mary Ellen asked to see the deceased, defendant assured her that everything was all right and that her mother was still sleeping. Mary Ellen then left for school and when she returned, at approximately 2:15 p. m., she found a note from her father, stating that he and the deceased went on a trip and would return in a few days. Because it was unlike the deceased to leave without saying goodbye and because it was unusual for defendant Homer to spend the night at the house, Mary Ellen went to the police station later that night and related the above facts.

Following this conversation, the police officers accompanied Mary Ellen to her home. In the basement they discovered blood and observed that the floor had been freshly mopped. They also found a blood stained mattress pad on Marian Hanrahan's bed and noticed that the sheets and covers were missing. Mary Ellen checked her mother's closet and found that none of her clothes were missing.

Later that day, police officers went to the fraternity house where defendant Michael Hanrahan was living. They arrested him for battery to his mother and read him his Miranda rights. He was then taken to the Niles Police Station.

At the station, defendant Michael made several statements, after first having been read his rights on each occasion. One of the statements, which was introduced as evidence during trial and is part of this appeal, was given to officer Giovannelli. The substance of the statement was that on November 20, 1974, defendant Michael heard his father and the deceased arguing in the basement. When he heard a loud crash, he ran downstairs and saw his father, defendant Homer Hanrahan, standing over the deceased with blood on him and saying "Oh my God, what have I done?" Defendant Michael stated further that at approxi-

mately 11:30 a. m. the next day, he helped his father place the deceased in the trunk of the car and that he heard her moan.

Before officer Giovannelli was allowed to testify concerning this statement, the State objected on the ground that the statement only incriminated defendant Homer Hanrahan. However, defendant Homer stated that he did not object to the statement as long as the jury was instructed not to consider it against him. Accordingly, the court overruled the State's objection and admonished the jury to consider the statement only against defendant Michael.

Sometime during the evening of November 22, 1974, the day defendant Michael was arrested, police officers went to the home of Roberta Stiles. Miss Stiles was purportedly the girlfriend of defendant Homer Hanrahan. The officers knocked on the door and were admitted by Miss Stiles. Once inside, the officers observed defendant Homer's brown Chevrolet parked in the garage. The officer telephoned assistant State's Attorney Pappas, who advised the officers to open the trunk to determine whether the victim was still inside. The trunk was opened and the victim was found inside, dead.

Once arrested, defendant Homer was taken to the Niles Police Station where he was questioned by Mr. Pappas. He was also questioned by assistant State's Attorney Gino DiVito, who had previously questioned defendant Michael. During the questioning sessions, defendant Homer gave a statement, just as Michael had earlier.

During the trial, there was a discussion concerning the method of introducing the statements of the defendants. The trial court subsequently ruled that the statements could be admitted without excising references to the other co-defendant. The jury was then admonished that the statements could only be used against the declarant.

Mr. DiVito testified that defendant Michael Hanrahan related the following detailed account. On November 20, 1974, at 7:45 p. m., he and his father met at a restaurant. The purpose of the meeting was to discuss plans for holding the deceased captive until she agreed to sign title to the house in Niles over to the children. He stated that when they left the restaurant defendant Homer gave him a loaded, automatic pistol. Defendant Homer then went to purchase beer, while defendant Michael went home, arriving there the same time as the deceased. They entered together and a short time later, defendant Homer arrived. All three of them then went into the basement where defendant Michael produced a gun and demanded that the deceased sign the house over to the children. During this time defendant Homer was attempting to blindfold the deceased. She struggled and in the process kicked defendant Michael in the groin. In response, defendant Michael hit her on the head with the gun, causing her to fall to the floor unconscious. The deceased bled profusely and the defendants used towels to clean up the blood. When the deceased occasionally regained consciousness, defendant Homer would administer chloroform.

Defendant Michael told Mr. DiVito that a slit was then cut into the deceased's slacks, through which defendant Homer injected drugs directly into her buttocks and anus. Previously, defendant Homer had bound the deceased's hands and feet. When Mary Ellen and Steve came home, they were sent directly to bed. Because both defendants were splattered with blood, they removed their outer clothing and washed them in the washing machine. Defendants later carried the deceased up to her bedroom and defendant Michael went to sleep.

The next time defendant Michael saw the deceased was at 6:30 a. m. the next day. She was in bed, with a bandage wrapped around her head. Defendant Homer assured him that everything was all right, so he left for school. When he returned from school at approximately 10:30 a. m., he helped defendant Homer carry the deceased from the bedroom. She was wrapped in the sheets and blankets from the bed and placed into the trunk of the car. It was at this point that defendant Michael believed he heard the deceased groan. He noticed

that the deceased was naked and that her arms and legs were still tied. Before leaving the house, defendant Homer wrote a note to Mary Ellen and Steve, explaining that their mother and he were going on a vacation.

Mr. DiVito also testified concerning a post-arrest statement given by defendant Homer Hanrahan in the presence of Mr. Pappas and Mr. DiVito. Mr. DiVito testified that defendant Homer stated "Blame it all on me. I did it, my son was not involved." He then went on to give the location of the gun, blankets, towels, bandages, and the deceased's clothing. Defendant Homer identified the drug used as Sparine and admitted injecting it into the deceased's buttocks. Defendant Homer stated that he was familiar with drugs because of his previous employment as a drug salesman. He further stated that defendant Michael hit the deceased in the head with the gun after she produced a knife. At this point, Mr. DiVito testified, defendant Homer requested an attorney and the interview then ceased.

At this point in the trial, the jury was again admonished that the statements of each defendant could only be considered against the declarant and not against the other co-defendant.

At the opening of the defendants' case, defendant Homer Hanrahan testified in his own behalf. He testified that on November 20, 1974, he met defendant Michael at a restaurant at 7:45 p. m., prior to a prearranged meeting with the deceased. The purpose of the meeting with the deceased was to work out a property settlement in their pending divorce. He stated that he wanted to get the deceased away from the influence of her parents while working out the settlement.

On his way to the deceased's house, he stopped at a liquor store to cash a check and purchase beer. He stated that when he arrived at the deceased's house, he noted that her eyes and walk appeared "funny". The deceased was an epileptic and occasionally had seizures. The seizures were never severe, but on occasion, defendant Homer

had to inject her with Sparine in order to calm her.

Defendant Homer and the deceased proceeded to the basement where they began sorting certain bills that he had paid and believed should be credited towards his child support payments. He testified that during this time the deceased began yelling and screaming incoherently and then collapsed to the floor. When he tried to pick her up, she produced a knife. A struggle ensued, during which two tables were overturned and he received a cut on his hand. At this point defendant Michael entered the basement and attempted to separate them. The deceased kicked Michael and then bumped her head on a post, causing her to fall to the floor bleeding and semiconscious. Defendant Homer then went into the kitchen to find towels so that he could clean up the blood.

When defendant Homer went back to the basement, defendant Michael suggested that they call a doctor. Defendant Homer refused, however, because he believed that the deceased would blame him for her injuries and that he would be arrested.

Mary Ellen had since arrived home and been sent to bed. Because defendant Homer did not want her to hear the deceased moaning, he injected the deceased with Sparine. In order to do this, he cut a slit in her slacks and attempted to administer a tablet rectally. When several attempts failed, he injected a quantity of the drug directly into her anus and buttocks. At this time the deceased was moaning and said "It hurts." Thereafter, both defendants washed their clothes and cleaned the basement.

At approximately 10:15 p. m., Jerry Wallenberg, defendant Homer's brother-in-law, telephoned to say that he was bringing Steve Hanrahan home. Fearful of being discovered, defendant Homer covered the deceased's mouth with tape and gave her another injection of Sparine.

After Steve was sent to bed, the defendants carried the deceased to her bedroom. Defendant Michael again suggested that a

doctor be called, but defendant Homer refused, assuring Michael she would be fine after she "slept it off". Defendant Homer then undressed the deceased and pulled covers over her.

The next morning, after all of the children, including defendant Michael had left for school, defendant Homer attempted to awaken the deceased. When she would not awaken, he realized that she was dead. Panicking, he attempted to lift her from the bed, but could not do so because she was too heavy and her arms and legs were too cumbersome. In order to facilitate her eventual removal from the room, he bound her arms and legs.

When defendant Michael unexpectedly returned home at 10:30 a. m., defendant Homer informed him that his mother was dead. The two defendants then placed the body in the trunk of the car and defendant Homer drove to the home of Roberta Stiles where he was later arrested. Defendant Michael went to a job interview.

At the conclusion of the trial, the jury found defendant Homer Hanrahan guilty of murder, aggravated battery, aggravated kidnapping, and conspiracy. He was sentenced to serve concurrent sentences of 50 to 100 years for murder, 20 to 40 years for aggravated kidnapping, and 3 to 10 years for aggravated battery. Defendant Michael Hanrahan was found guilty of aggravated kidnapping, aggravated battery, and conspiracy. He was sentenced to serve concurrent sentences of 10 to 25 years for aggravated kidnapping and 3 to 10 years for aggravated battery. Defendants appeal.