THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHN EDMONDS, Defendant-Appellant.

First District (5th Division)   No. 78-1800

Opinion filed November 30, 1979.

Ralph Ruebner and Michael Mulder, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Iris E. Sholder, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Defendant, in this appeal from an order granting the State's motion to dismiss his petition for post-conviction relief, contends he was improperly denied an evidentiary hearing.

Defendant was tried and convicted of rape in 1974.[1] At trial, the complainant testified that at approximately 11:50 a.m. on October 18,

---

[1] Defendant was also convicted of contributing to the sexual delinquency of and indecent liberties with a child. On direct appeal, the State confessed error in that these three convictions arose out of a single act, and this court accordingly affirmed the rape conviction and reversed the convictions for the other two offenses.

1971, she was walking back for her seventh grade school classes after having been home for lunch. She heard a rapping sound and saw a man, whom she identified as defendant, standing in the window of a house at 6500 Woodlawn Avenue. The man motioned for her to come to the back door, and as she approached he grabbed her by the jacket and pulled her into the kitchen. She broke loose and ran into the dining room, but he ran after her and caught her in the living room, where he put his arm around her neck and dragged her to the basement. Several mattresses were leaning against the wall there, and defendant placed one of them on the floor and pushed her onto it. He removed her panties and girdle, got on top of her, and inserted his penis in her vagina for approximately 10 minutes, during which time she was crying and trying to push him off. Defendant eventually got up, said she should dress, and told her not to tell anyone about the incident. When he released her, complainant ran home and told her older sister (Dianne) what had happened. Complainant also testified that when the police arrived she told them what happened, and an officer then drove her and her mother to Billings Hospital where she was examined by Dr. Stokes. She was later taken to Ida Mae Scott Hospital, where she was examined by Dr. Conte. Dianne testified that complainant had left for school and returned home at approximately 12:15 p.m. She was hysterical and stated that she had been raped by a man at 6500 South Woodlawn.

Police Officer Modesto testified that on the date of the incident, he was assigned to a car with his partner (Dennis Dixon). After a conversation with complainant and her sister Dianne, the officers started a search for a man with a limp residing at 6500 Woodlawn. Upon their arrival at that address, when a woman opened the door, he observed a man having a limp who was in the house. He later identified that man as defendant. After placing defendant under arrest, he observed several mattresses stacked against the wall in the basement.

Dr. Conte, who examined complainant at Ida Mae Scott Hospital, testified that he is a surgeon engaged in general practice and surgery since 1954. He is complainant's family physician and performed a gynecological examination of her on October 18, finding abrasions and cracks in the fusea (lower portion) of the vagina. He had previously made 5,000 to 10,000 such examinations. On cross-examination, he stated that he did not check for the presence of sperm, because there was "obvious evidence of a forceful entry."

Frank Scott, testifying in defendant's behalf, stated he had known defendant since 1965, and that on October 18, 1971, he (Scott) was at Gray's Lounge on East 79th Street continuously from approximately 9 or 9:30 a.m. until 12:25 or 12:30 p.m. Defendant was also at Gray's Lounge during this time and was still there when he (Scott) left. Leona Scott

(Frank's wife) also testified she knew defendant. She was with Frank at Gray's Lounge continuously and saw defendant there.

Defendant testified in his own behalf that he was at Gray's Lounge at the time of the incident and was there until approximately 1 p.m. He denied having intercourse with complainant and stated that because of his limp he "can't run at all."

In his *pro se* petition for post-conviction relief, defendant alleged his constitutional rights were violated when the trial judge refused to admit certain evidence. A supplemental petition was then prepared by the public defender, stating essentially that defendant's privately retained trial counsel was incompetent in that he failed to introduce the testimony of Dr. Stokes, who had examined complainant at Billings Hospital and whose findings were allegedly favorable to defendant and contradictory of those of Dr. Conte, and that his counsel made no effort to exhibit defendant's deformed left leg to the jury—which allegedly would have tended to prove that he could not have run after complainant, as she testified.

Attached to the petition was the affidavit of Dr. Stokes, stating that on October 18, 1971, he was serving as a resident in obstetrics and gynecology at Billings Hospital; that on that date he performed a gynecological examination of complainant which disclosed erythema (redness) of the vaginal area but no lacerations were noted and the hymen showed no signs of trauma; that based on his examination, it was his opinion that proof of rape was inconclusive because there was no physical evidence of penetration; and that at the time of trial he was employed at Vandenburg Air Force Base Hospital in California but was willing to testify had he been called. Also attached was the affidavit of John A. Arrigo, assistant public defender, stating that on December 21, 1977, in a telephone conversation, he informed defendant's trial counsel that he was working on defendant's supplemental petition; and that in response to his questions, trial counsel stated that he did not recall either speaking with Dr. Stokes or making any effort to arrange Dr. Stokes's presence at trial; and that he did not then feel that it was necessary to call Dr. Stokes to testify. Finally, three photographs of defendant's left leg were attached, along with defendant's affidavit stating that the photographs were true and accurate representations of his leg as it appeared on October 18, 1971.

Defendant's petition was dismissed without a hearing on the State's motion, and this appeal followed.

OPINION
■■■ Defendant's sole contention is that the trial court erred in dismissing his petition for post-conviction relief without an evidentiary hearing on his allegations that his retained trial counsel was so incompetent as to

deprive him of his constitutional right to effective assistance of counsel. The State initially argues that defendant is barred from asserting the incompetency of trial counsel under *res judicata* principles because it could have been raised in his prior direct appeal but was not. (*People v. Adams* (1972), 52 Ill. 2d 224, 287 N.E.2d 695; *People v. Smith* (1977), 56 Ill. App. 3d 569, 371 N.E.2d 921; *People v. Carlton* (1975), 31 Ill. App. 3d 313, 333 N.E.2d 596.) We note, however, that when allegations in a post-conviction petition of trial counsel's incompetence are based on facts which do not appear in the record, they are not barred by the doctrine of *res judicata.* (*People v. Turner* (1979), 74 Ill. App. 3d 840, 393 N.E.2d 55; *People v. Dennis* (1973), 14 Ill. App. 3d 493, 302 N.E.2d 651.) Where charges of incompetence are based on trial counsel's failure to call certain witnesses or introduce certain evidence, the substance of which does not appear in the record, it therefore cannot be claimed that such charges should have been raised in the direct appeal. (*People v. Turner.*) In the case at bar, defendant alleges incompetency because his counsel failed to call Dr. Stokes to testify and failed to exhibit his leg to the jury. Since these are matters which do not appear in the record and thus could not have been raised in the direct appeal, defendant is not barred from making such allegations in his petition.

Turning next to the merits of defendant's contention that he was improperly denied an evidentiary hearing, we note that in order to obtain such a hearing under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1977, ch. 38, par. 122—1 *et seq.*), a defendant must make a substantial showing that his constitutional rights have been violated (*People v. Ashley* (1966), 34 Ill. 2d 402, 216 N.E.2d 126; *People v. Patterson* (1975), 35 Ill. App. 3d 1, 340 N.E.2d 546), and the burden is on him to clearly set forth the violation and support such allegations with affidavits and other evidence (*People v. Dean* (1975), 28 Ill. App. 3d 196, 328 N.E.2d 130). Further, in assessing the sufficiency of the allegations, the trial court is to consider the petition in the light of the entire record. (*People v. Bennett* (1974), 20 Ill. App. 3d 828, 314 N.E.2d 320.) If the allegations and supporting documents were true and would establish a constitutional violation, the trial court must hold a hearing to determine the actual facts. (*People v. Stepheny* (1970), 46 Ill. 2d 153, 263 N.E.2d 83; *People v. Sigafus* (1968), 39 Ill. 2d 68, 233 N.E.2d 386.) Thus, the question with which we are presented is whether defendant's petition and affidavits, considered in the context of the trial record, would amount to ineffective assistance of counsel of constitutional proportions.

In this regard, we initially note that the parties are in apparent disagreement as to the constitutional standard by which the competency of retained trial counsel is to be measured. Defendant argues that a due process deprivation exists if the two-pronged test enunciated in *People v.*

*Morris* (1954), 3 Ill. 2d 437, 121 N.E.2d 810, is satisfied. In *Morris,* the supreme court considered defendant's allegations in a post-conviction petition that his appointed trial counsel was incompetent as to deprive him of due process and explained:

> "[T]he defendant must clearly establish: (1) actual incompetency of counsel, as reflected by the manner of carrying out his duties as a trial attorney; and (2) substantial prejudice resulting therefrom, without which the outcome would probably have been different." (3 Ill. 2d 437, 449, 121 N.E.2d 810, 817.)

The State argues, however, that the above standard applies only to appointed counsel and that the proper yardstick applicable here, where counsel was privately retained, is whether the representation was of such a low caliber as to amount to no representation at all or was such as to reduce the proceedings to a farce or sham. Indeed, this standard was applied in several cases after *Morris* where trial counsel was retained. *E.g., People v. Washington* (1968), 41 Ill. 2d 16, 241 N.E.2d 425; *People v. Bennett* (1974), 20 Ill. App. 3d 828, 314 N.E.2d 320.

Other cases subsequent to *Morris* have apparently caused some confusion as to whether separate tests are applicable to retained and appointed counsel. However, the supreme court applied elements of the two-pronged test in conjunction with the "farce or sham" test in cases where trial counsel was retained (*People v. Bliss* (1970), 44 Ill. 2d 363, 255 N.E.2d 405) or appointed (*People v. Dean* (1964), 31 Ill. 2d 214, 201 N.E.2d 405). Apparently in reliance on such cases, a series of decisions have held that the "farce or sham" standard is applicable regardless of whether trial counsel is appointed or retained. (*People v. Shestiuk* (1978), 59 Ill. App. 3d 296, 376 N.E.2d 56; *People v. Virgil* (1977), 54 Ill. App. 3d 682, 370 N.E.2d 74; *People v. Hawkins* (1974), 23 Ill. App. 3d 758, 320 N.E.2d 90; *People v. Ortiz* (1974), 22 Ill. App. 3d 788, 317 N.E.2d 763; *People v. Long* (1973), 12 Ill. App. 3d 974, 298 N.E.2d 784.) In *People v. Virgil,* this court followed the supreme court and, in assessing the adequacy of retained trial counsel, cited both tests:

> "The requisite standard which has developed is the same in both instances of privately retained and court-appointed counsel, namely, the incompetency of counsel must not be of such character as to reduce the trial to a farce or sham. [Citations.]
>
> In order to successfully support an allegation of inadequate representation at trial, defendant must clearly establish (1) actual incompetence of counsel, as reflected by the manner of carrying out his duties at trial, and (2) substantial prejudice resulting, without which the outcome would probably have been different. [Citations.]" 54 Ill. App. 3d 682, 686-87, 370 N.E.2d 74, 77-78.

Most recently, in *People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d

677, the supreme court was again confronted with the question of whether privately retained counsel was so incompetent as to deprive defendant of due process and, without mentioning the two-pronged test in any respect, stated:

"A strict test is applied in determining whether privately retained counsel is incompetent:

'In such a case the court will not reverse a conviction because of the incompetency of counsel unless the representation is of such a low caliber as to amount to no representation at all or reduces the court proceedings to a farce or sham.' [Citations.]"

(72 Ill. 2d 421, 436, 381 N.E.2d 677, 685.)

In apparent reliance upon *Murphy*, it was stated in *People v. Bland* (1978), 67 Ill. App. 3d 716, 384 N.E.2d 1380:

"The State argues that counsel's conduct did not amount to no representation at all or reduce the proceedings to a farce or sham. While that remains the standard as to *retained* counsel (*People v. Murphy*), the standard applicable to appointed counsel is still that first advanced in *People v. Morris* (1954), 3 Ill. 2d 437, 449, 121 N.E.2d 810, 817: '(1) actual incompetency of counsel, as reflected by the manner of carrying out his duties as a trial attorney; and (2) substantial prejudice resulting therefrom, without which the outcome would probably have been different.' " 67 Ill. App. 3d 716, 724, 384 N.E.2d 1380, 1388.

▮ Thus, it is not particularly clear whether we are to apply only the "farce or sham" test in assessing the competence of retained counsel, or if we are also to consider the two-pronged test of *Morris*. In any event, it appears that all cases are in agreement that at least the "farce or sham" test is to be applied and, in this regard, we note that application of the two-pronged test in conjunction with the "farce or sham" test may be pointless since it is difficult to conceive of a trial which would amount to a "farce" and yet would not also manifest "actual incompetence of counsel" and cause "substantial prejudice."

▮ We turn then to the petition and affidavits filed in the instant case to determine whether they meet the "farce or sham" test. We conclude they did not. Initially, we note our belief that the failure to call Dr. Stokes does not indicate incompetence. Dr. Stokes stated in his affidavit that his examination of complainant disclosed no lacerations in the vaginal area and that the hymen showed no signs of trauma; however, he also stated that he detected erythema or redness and that proof of rape was in his opinion "inconclusive." Thus, while Dr. Stokes' statement that he found no lacerations contradicted Dr. Conte's observations, his equivocal statement of the inconclusiveness of rape, together with his findings of

erythema, would not have appreciably helped defendant's case and, in fact, may have been damaging. Further, Dr. Conte testified that he had performed 5,000 to 10,000 gynecological examinations during his career since 1938; whereas, Dr. Stokes was yet a resident when he examined complainant. In the light thereof, trial counsel may well have believed it prudent not to call Dr. Stokes to testify.

With respect to the charge that trial counsel failed to display defendant's leg to the jury to counter complainant's testimony that he had run after her when they were in the residence, we note that defendant did testify that he limped and could not run, and while an exhibition of his leg might have corroborated his testimony, there appears to be no contrary testimony. Officer Modesta testified that after talking to complainant in her home, he left to search for a man with a limp and that defendant was arrested after the officer saw him limping. Furthermore, a viewing of defendant's leg would not necessarily have cast doubt on complainant's testimony that he ran after her, since this brief chase occurred between rooms and it is possible that defendant, though limping, could have lunged at her or otherwise moved in a quick fashion. Neither the photographs presented nor any other record evidence negates this possibility.

■■ In addition, we believe that trial counsel's competence is demonstrated throughout the trial record, which discloses that he vigorously cross-examined three of the State's four witnesses, voiced strenuous objections at appropriate times, called two alibi witnesses to testify, moved and capably argued for a directed verdict at the close of the State's case in chief, delivered a commendable closing argument, moved and argued for a new trial, and called the pastor of defendant's church to testify at the aggravation and mitigation hearing for sentencing. In view thereof, we conclude that trial counsel's failure to call Dr. Stokes to testify and to exhibit defendant's leg to the jury were reasonable trial tactics and, as such, cannot be said to establish incompetence. *People v. Somerville* (1969), 42 Ill. 2d 1, 245 N.E.2d 461; *People v. Dean* (1975), 28 Ill. App. 3d 196, 328 N.E.2d 130.

In support of his position, defendant cites *People v. Stepheny* (1970), 46 Ill. 2d 153, 263 N.E.2d 83, where after being convicted of voluntary manslaughter, defendant filed a post-conviction petition alleging incompetency of his appointed trial counsel which was dismissed without an evidentiary hearing. While the supreme court held that defendant was entitled to such a hearing, we see the facts in *Stepheny* to be distinguishable. *Stepheny* involved allegations that defendant's trial counsel failed to call two witnesses whose testimony appeared to unequivocally support the theory of self-defense, which defendant had argued at trial. In the case at bar, however, the omitted evidence does not

unequivocally support defendant but, as noted above, trial counsel in his judgment could well have concluded that the evidence might have been as damaging as it would have been helpful. Furthermore, *Stepheny* applied only the two-pronged test set forth in *Morris* and did not apply the "farce or sham" standard which we are now utilizing. We therefore reject defendant's contention that he was entitled to a hearing under *Stepheny*.

Viewing defendant's petition and supporting documents in the light of the entire trial record, we do not believe it has been established that the representation by defendant's trial counsel was of such a low caliber as to amount to a "farce or sham" and that the trial court correctly dismissed the petition.

Accordingly, we affirm the order dismissing defendant's petition for post-conviction relief.

Affirmed.

LORENZ and MEJDA, JJ., concur.