THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PHILLIP MEEKS, Defendant-Appellant.

First District (3rd Division)   Nos. 1—91—1192, 1—91—4123 cons.

Opinion filed June 30, 1993.

Patricia Mysza, of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Christine Cook, and Kevin M. Gleason, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

On June 13, 1989, following a jury trial, defendant, Phillip Meeks, was found guilty of attempted first degree murder (Ill. Rev. Stat. 1989, ch. 38, pars. 8—4, 9—1) and sentenced to 45 years' imprisonment. On October 8, 1991, defendant filed a *pro se* petition for post-conviction relief. The trial court dismissed the petition and a late notice of appeal was filed.

On appeal, defendant asserts that (1) the post-conviction court erred in denying his timely filed motion for recusal, which alleged that the judge was biased and would be a witness in the post-conviction proceedings; (2) the post-conviction court's summary dismissal of

the *pro se* post-conviction petition must be reversed because the petition raised the constitutional claim that the prosecutor knowingly used false testimony at trial; (3) his right to self-representation was denied because the trial court granted his motion to proceed *pro se* and appointed an assistant public defender to assist him, but allowed counsel to conduct the entire defense; (4) he is entitled to a new post-trial motion hearing because the trial court denied his *pro se* motions to inquire into the assistant public defender's ineffectiveness and for a continuance; (5) he did not make a valid waiver of his right to counsel at sentencing because the trial court failed to admonish him of the nature of the offenses and the minimum and maximum sentences he faced; and (6) he is entitled to a new sentencing hearing. We affirm.

Prior to trial, there were nine months of pretrial motions. During that time, defendant alternately waived his right to counsel and accepted representation by an assistant public defender. In addition to the pretrial motions filed by the defense counsel, defendant filed nearly 20 *pro se* motions and petitions. Just prior to the start of trial, the trial court granted defendant's request to proceed as co-counsel with assistant public defender Edward Ptacek. When jury selection began, the trial court identified Ptacek to the prospective jurors as defendant's attorney.

At trial, Antonine Heath testified that she and defendant had been involved in a relationship from 1984 until August 14, 1988. On that date, defendant moved into a second-floor apartment in the same building where Heath and her three children lived on the third floor.

On the morning of September 10, 1988, two of Heath's friends, Marvin Gibbs and Terry Johnson, helped her with repairs in her apartment. Sometime after noon, Heath, Gibbs, and Johnson left the apartment and went to Heath's car, which was parked in an adjacent lot.

As Heath put her key into the ignition, she saw defendant running toward her with a shotgun, which was pointed at the car. Gibbs and Johnson got out of the car and ran across the parking lot. Unable to escape, Heath lay down on the front seat. She heard a gunshot and glass shattering, then felt something strike her in her left hip area.

A few minutes later, Heath sat up and reached for the driver's side door handle. She saw defendant by the front passenger door pointing the shotgun at her. Heath pushed the driver's side door open and heard another shot, which struck her in the right side of the neck. Heath fell to the ground and lay on the ground beside the car with both her hands over her head. Defendant stood over Heath and shot her in her hands.

Heath lay still with her eyes closed until paramedics arrived and took her to the hospital, where she remained for four weeks. As a result of the shooting, Heath lost three fingers on her left hand and her right wrist is fused in place by a bone taken from her pelvis. She returned to the hospital on at least two occasions for further treatment.

On cross-examination, Heath testified that she had lived with defendant for over three years and he helped support her three children. Heath had an argument with defendant on August 13, 1988, which was the day before defendant moved out. The trial court sustained the State's objections to questions relating to the subject of the argument.

In a sidebar, defendant asked the trial court if Heath could be cross-examined regarding her eviction from her apartment in July of 1988 and the events in August 1988 that precipitated his moving out. The trial court denied defendant's request.

Terry Johnson then testified that he saw defendant working on his car outside Heath's apartment building on the morning of September 10, 1988. After finishing repairs in Heath's apartment, Johnson, Gibbs, and Heath went to Heath's car, where Johnson got into the car's back seat. He saw defendant running toward the car with a shotgun in his hand. As defendant fired a shot through the driver's side window, Johnson heard him say, "I couldn't take it no more."

Johnson and Gibbs fled from the car, ran across the parking lot, and hid behind a nearby van. Johnson heard a second shot, then saw defendant go around the front of the car and point the gun downward toward Heath. After hearing a third shot, Johnson saw defendant throw the gun on his shoulder and run down a nearby alley.

In a sidebar conference during Johnson's cross-examination, defense counsel informed the trial court that defendant wanted to participate more directly in the proceedings. The trial court denied the request.

Prior to recommencing the proceedings on the following day, defendant informed the court that he learned the previous evening, during several phone calls, that the prosecutor had promised Heath $25,000 to testify falsely against him. Defendant would not divulge the source of this information. After briefly speaking with defendant, defense counsel informed the court that defendant wanted to be excluded from the courtroom. The trial court did not respond.

Nathaniel Heath, Antonine Heath's 13-year-old son, testified that he was looking out the front window when he saw his mother, Gibbs, and Johnson walk toward the rear of their building. He also saw

defendant, who was sitting on a porch two houses away, go to his car, which was in front of the apartment building. Defendant got a shotgun from under the driver's seat and walked toward the rear of the building.

Nathaniel ran to the dining room window, from where he saw defendant point the shotgun at the driver's side window of Heath's car and say, "I'm tired of this." Defendant fired the gun, and glass shattered as Gibbs and Johnson ran from the car. Defendant went around to the passenger side, raised the shotgun, and fired a second shot into the passenger side window.

When Nathaniel saw his mother fall out of the car, he awoke his sister. The two of them ran to the kitchen window, from where Nathaniel saw defendant put the gun over his shoulder and run down a nearby alley.

Tane Lynette Heath, Antonine Heath's 15-year-old daughter, testified that she was lying down in her room when she heard two loud noises. Nathaniel ran into her room and the two of them went to the kitchen window, from where Tane saw her mother open the car door and fall out. Defendant, who had a shotgun in his hands, was walking around the car to where Heath was lying on the ground. Tane began to scream for help and ran outside.

Following this testimony, a sidebar was held. The trial court informed defendant that he could present any additional information regarding the alleged telephone conversations he had concerning the possible bribing of witnesses by the State. Defendant presented no additional information but requested to be excused from the courtroom until sentencing.

Defendant stated that he disagreed with the defense theory Ptacek intended to present, which was that defendant did not intend to kill Heath. In addition, defendant asked that subpoenas for three defense witnesses be rescinded because their testimony would address the defense theory defendant wanted to present, which was that he was provoked by the victim as a result of her alleged love affairs with other men, rather than address Ptacek's defense theory. Ptacek told the court that he had spoken to two of the three witnesses and did not think that their testimony would be admissible. When the jury returned, the trial court informed it that defendant was exercising his right not to be present for the remainder of his trial.

Next, Chicago police officer Frank Valadez testified that he arrived shortly after the shooting. When Valadez ran through a nearby alley looking for defendant, he came upon a shed in the alley where he saw defendant, whom Valadez identified from a photograph, stand-

ing in the doorway. Defendant was holding the barrel of the shotgun in his mouth.

Shortly afterwards, the Hostage Barricade Tactical Team arrived. After speaking with defendant for 2½ hours, defendant surrendered. Valadez returned to the scene of the shooting and recovered three spent shells near Heath's car. He also searched defendant's car and found a box of shotgun shells in the trunk.

After the State rested, defendant returned to the courtroom and testified in his own behalf. Defendant, who was 58 years old, testified that he met Heath in October 1984 and lived with her and her three children from January 1985 until August 1988. The relationship began to deteriorate and defendant learned that Heath was having an affair with Marvin Gibbs.

On August 13, 1988, defendant drove Heath to her mother's house and waited outside. While speaking with a neighbor, defendant saw Gibbs go into the house. Defendant drove his car around the back of the house where he saw Heath and Gibbs speaking. Defendant told Heath that they were going home, but Heath refused and defendant left. Later that day, Heath came home and threw defendant's musical equipment off the third-floor porch. Defendant moved out of Heath's apartment and into his brother's apartment on the second floor. Defendant admitted that he fired the shotgun at Heath, but he did not intend to kill her and did not say, "I can't take it no more."

On cross-examination, defendant testified that he drove to a Robbins lounge before he drove Heath to her mother's house on August 13, 1988. Defendant denied that he tried to run down Gibbs in the alley behind Heath's mother's house or that he kicked in Heath's apartment door when he returned to the apartment. Defendant stated that he asked Heath's three children to leave rather than kicking them out of the apartment. About one-half hour later, Heath returned with defendant's brother, who convinced defendant to let Heath and her children back into the apartment. That evening, defendant stayed with his brother.

In rebuttal, Heath testified regarding the incident on August 13, 1988, when defendant drove her to her mother's house. Heath stated that defendant drove to a Robbins night club and several other clubs before dropping her at her mother's house. When Gibbs came to the house's back door from the alley, Heath told him to leave. As they were talking near the alley, Heath heard the sound of a car driving fast and saw defendant's car turn into the alley, approaching Gibbs as if he were going to hit him. Gibbs jumped out of the way to avoid being run over by defendant's car.

Heath later returned to her apartment and found her children were not there. Defendant's brother, who lived downstairs, let her and her children into her apartment and took defendant to his second-floor apartment.

After deliberating, the jury found defendant guilty of attempted first degree murder.

On July 7, 1989, the date set for sentencing, defense counsel filed a motion for a new trial and defendant filed a *pro se* motion for a continuance alleging that he needed additional time to prepare a post-trial motion since he had not had access to the jail's law library. Defendant also filed a *pro se* motion to allow defense counsel to withdraw and a motion for an evidentiary hearing to inquire into defense counsel's deliberate ineffectiveness.

When defendant objected to defense counsel's post-trial motion for a new trial, the court overruled the objection and denied the motion. The trial court then granted defendant's motion to proceed *pro se* and discharged defense counsel.

Because of the allegations in defendant's *pro se* motion, the trial court allowed the State to call Assistant State's Attorney Katherine Quattrocchi as a witness regarding the alleged bribe she paid Heath. Quattrocchi denied bribing Heath and defendant declined to cross-examine her.

The case proceeded to sentencing with defendant representing himself. In aggravation, the State highlighted defendant's criminal history as compiled in the presentence investigation report and noted the severe injury defendant's conduct caused Heath. After being given the opportunity, defendant presented no evidence or argument in mitigation. Based on the evidence, the trial court found defendant's conduct to be both brutal and heinous and sentenced him to 45 years' imprisonment.

On October 8, 1991, defendant filed a petition for post-conviction relief, which was supported by his own affidavit. The petition alleged that defendant was deprived of his right to due process because a prosecutor had paid Heath $25,000 so that she and her two children would give false testimony against him. The petition included a summary of the alleged affidavits of Heath and Robinson. Heath's affidavit, according to defendant, allegedly stated that the prosecutor promised her $25,000 if she and her two children testified falsely against defendant. Robinson's affidavit, according to defendant, allegedly stated that on May 25, 1989, Heath told her about the prosecutor's promise of money in exchange for her testimony. In the petition, defendant explained that he could not attach the two affidavits be-

cause he was awaiting a copy of the common law record and transcripts of the trial proceedings.

The post-conviction petition also alleged that defendant was deprived of his constitutional right to appeal his conviction and sentence because the trial court failed to advise him of his right to appeal and the assistant public defender failed to file a notice of appeal.

Along with the post-conviction petition, defendant filed a motion for recusal of Judge Karnezis, supported by defendant's affidavit. The motion alleged that during the pretrial proceeding on April 20, 1989, defendant, who had been representing himself, requested the appointment of counsel other than the public defender. According to defendant, the judge left the bench, went to his chambers, made a telephone call, and told the person on the other end of the line that defendant was requesting counsel other than the public defender. Upon returning to the bench, the judge denied defendant's request and appointed the assistant public defender. The motion alleged that the judge did not disclose the substance of this "ex parte" communication, which had the appearance of impropriety. Furthermore, the motion requested the recusal of Judge Karnezis because he would be called as a witness in the post-conviction proceedings.

On October 18, 1991, Judge Karnezis dismissed defendant's petition for post-conviction relief finding that his right to appeal had not been denied, was indeed pending, and all the points in the petition could be raised on direct appeal. The judge noted that the issues raised in this petition had been heard by the trial court at either the time of the trial or during post-trial proceedings. The judge also denied the recusal motion.

On appeal, defendant asserts that the post-conviction judge erred in denying his motion for recusal since the motion was timely filed, alleged that the judge was biased, and alleged that the judge would be a witness in the post-conviction proceedings. Specifically, defendant's motion claimed that Judge Karnezis had an undisclosed, *ex parte* telephone conversation with someone during the April 20, 1988, pretrial hearing.

Initially, defendant maintains that under the Illinois Supreme Court case *People v. Wilson* (1967), 37 Ill. 2d 617, 230 N.E.2d 194, the judge had the discretion to recuse himself and should have done so under the circumstances. Defendant argues that the judge's denial of the motion was an abuse of discretion since the alleged *ex parte* conversation occurred in relation to defendant's right to counsel.

■ The trial court did not abuse its discretion in denying defendant's recusal motion. Neither the civil nor criminal substitution of

judge provisions specifically apply to post-convictions proceedings even though the proceedings are civil in nature. (*Wilson*, 37 Ill. 2d at 619.) Thus, the right to substitution of judges is not absolute in a post-conviction proceeding. (*Wilson*, 37 Ill. 2d at 620.) Although the judge should recuse himself under certain circumstances (see *People v. Washington* (1967), 38 Ill. 2d 446, 451, 232 N.E.2d 738; *Wilson* 37 Ill. 2d at 619; *People v. Short* (1978), 66 Ill. App. 3d 172, 383 N.E.2d 723), those circumstances did not exist here. There is nothing in the record to indicate that the judge ever left the bench during the April 20, 1988, hearing. Thus, there would be no reason for the judge to be a witness in the post-conviction proceeding.

Alternatively, defendant relies on a Fourth District Appellate Court case, *People v. Burton* (1982), 108 Ill. App. 3d 771, 439 N.E.2d 1037, for the proposition that he has an absolute right to a change of judges under the venue act of the Code of Civil Procedure. (Ill. Rev. Stat. 1987, ch. 110, pars. 2—1001(a)(2), (c).) *Burton* held that the civil statute is to be applied to post-conviction proceedings. (*Burton*, 108 Ill. App. 3d 771, 439 N.E.2d 1037.) We decline to follow the ruling in *Burton*, which is contrary to the earlier supreme court decision in *Wilson*. Under *Wilson*, the civil statute does not apply. *Wilson*, 37 Ill. 2d at 619.

Then, without citing any legal authority, defendant urges that the criminal automatic substitution of judge provisions apply in this case. Under those provisions, a defendant's recusal motion must be filed within 10 days after the cause is placed on the judge's calendar. (Ill. Rev. Stat. 1987, ch. 38, par. 114—5(a).) Furthermore, the request must be made before the trial judge has ruled on any substantive matter in the case so that the motion cannot be made in response to an adverse ruling on an issue. *People v. Emerson* (1987), 122 Ill. 2d 411, 424, 522 N.E.2d 1109.

We find that the criminal statute does not apply in post-conviction proceedings. Even if it did apply, however, we would reject defendant's assertion that the 10-day period for filing an automatic substitution of judge motion began when the post-conviction petition was assigned to Judge Karnezis. Although a post-conviction proceeding is civil in nature, it arises out of and is inextricably tied to the conviction. (*People v. Tucker* (1989), 178 Ill. App. 3d 838, 840, 533 N.E.2d 1148.) Thus, the post-conviction proceeding should not be separated from the original case for the purposes of time limits on the substitution of judges. This case was placed on Judge Karnezis' calendar on October 4, 1988, and the post-conviction recusal motion was filed on October 8, 1991, more than three years later.

Moreover, defendant would not be entitled to a substitution of judge on the basis of the criminal statute because his motion was not filed before Judge Karnezis ruled on a substantive matter in the case. In fact, the motion was filed in response to alleged circumstances surrounding Judge Karnezis' adverse ruling on defendant's request for counsel other than the assistant public defender. Consequently, we find that the court did not abuse its discretion in denying defendant's post-conviction motion for recusal.

Next, defendant asserts that the court's summary dismissal of his *pro se* post-conviction petition must be reversed because the petition raised the nonfrivolous constitutional claim that the prosecutor knowingly used false testimony at trial. Defendant alleges that Assistant State's Attorney Quattrocchi promised to pay Heath $25,000 if she and her two children testified against defendant. Defendant contends that this issue is properly raised in a post-conviction petition because it could not be raised on direct appeal. Defendant maintains that not only does it rely on facts not of record (*People v. Edmonds* (1979), 79 Ill. App. 3d 33, 37, 398 N.E.2d 230), but the trial court did not give him a continuance to obtain outside-the-record evidence to contradict the prosecutor's testimony.

Defendant waived this issue. The scope of a post-conviction proceeding is limited to constitutional issues that have not been, and could not have been, previously adjudicated. (*People v. Stewart* (1988), 123 Ill. 2d 368, 372, 528 N.E.2d 631.) Defendant first raised his allegation on June 13, 1989, in a sidebar conference during trial. The trial court gave defendant numerous opportunities to substantiate his allegations, but defendant refused to do so.

Defendant again raised the allegation against Quattrocchi during his hearing on post-trial motions. The trial court permitted Quattrocchi, who denied defendant's allegations, to testify at the hearing. Defendant, who was proceeding *pro se*, refused to cross-examine her. Defendant cannot refuse to substantiate allegations during the trial and post-trial proceedings and then raise those allegations in a post-conviction petition. The only reason that the facts alleged are not of record is because defendant refused to make them of record.

Next, defendant asserts that his constitutional right to self-representation was denied because the trial court thrust the services of the assistant public defender on him after it had previously accepted defendant's voluntary and intelligent election to proceed without counsel. We disagree.

According to the record, the trial judge patiently tried to protect defendant's rights to counsel and self-representation throughout the

pretrial, trial, and post-trial proceedings. On October 18, 1988, defendant filed a *pro se* petition for recognizance bond and alternative petition for bail bond reduction. During that hearing before Judge Karnezis, the prosecutor informed the trial court that defendant was convicted of retail theft in 1983. Defendant objected, stating that he had no conviction in 1983. The court denied defendant's motion and allowed the bond to stand.

On that same day, defendant filed a *pro se* motion for substitution of judges, the basis of which was that the judge was prejudiced against him evidenced by his denial of defendant's motion to reduce bond. The motion was transferred to another judge and was denied.

On November 16, 1988, defendant requested that the trial court allow assistant public defender Ronald Babb to withdraw. Stating that "[t]here has been no indication or no reason given why I should allow Mr. Babb to either voluntarily or involuntarily withdraw," the trial court denied defendant's request.

At the next court hearing, on December 9, 1988, defendant appeared *pro se* and presented a motion to proceed *pro se*, alleging that Babb did not vigorously challenge the State's contention that he had a prior retail theft conviction during the previous bond reduction hearing. He also expressed that any representation by the public defender's office would be a conflict of interest. After the trial court admonished defendant of his right to counsel and of the possible penalties associated with the pending charges, the trial court determined that defendant waived his right to counsel. The trial court dismissed the public defender's office and allowed defendant to proceed *pro se*.

On the same day, defendant filed a *pro se* motion requesting that Judge Karnezis recuse himself because of his previous ruling denying the motion to reduce bond. After the trial court allowed defendant to present a lengthy argument on his motion, the trial court denied the motion.

The trial court then asked defendant how much time he needed before the next court date, which would concern pretrial motions. Defendant indicated that he needed 10 days to two weeks. The trial court set December 22, 1988, as the next court date, but there is nothing in the record for that date.

On February 9, 1989, defendant and assistant public defender Thomas Brice appeared in court. Brice stated that he had been appointed as defendant's legal advisor. Defendant presented numerous *pro se* motions, including a motion to vacate the court order denying his previous motions for recusal and bond reduction. After lengthy

discussion, the trial court ruled against defendant. The following discussion occurred on the record:

"THE COURT: Thank you. The bond will stand. I am not going to recuse myself. Now, what's your next motion?

MR. MEEKS: At this time, your Honor, I would respectfully inform the court that I decline to participate in the proceedings any further."

THE COURT: Very good. Thank you. Mr. Meeks wants to decline to participate in the proceedings. Are you ready for trial, Mr. Meeks?

MR. MEEKS: I'm not participating any further, your Honor.

THE COURT: Okay. Mr. Meeks does not want to participate in the proceedings—no no, you stand right there, Mr. Meeks. I want you to understand we're going to set the case down for trial. What is your situation, State? You better check that.

[ASSISTANT STATE'S ATTORNEY]: Whatever date your Honor feels is appropriate. The People will have the matter ready for trial.

THE COURT: Are you agreeable to a continuance for trial, Mr. Meeks, or are you going to stand mute?

Mr. Meeks is going to stand mute so we will set this matter for trial.

\* \* \*

We might also state since Mr. Meeks does not wish to participate any further we will take no action on any other motions that were filed.

\* \* \*

\*\*\* [T]he record will essentially indicate that Mr. Meeks is choosing not to participate."

Brice then asked for a clarification of his role as defendant's legal advisor. After reviewing the case's history, Brice attempted to ask defendant whether he wanted Brice to continue to advise him. The following occurred:

"THE COURT: If you want to respond to that question, Mr. Meeks? Mr. Meeks chooses not to respond to that question. Mr. Brice, you will be appointed as attorney for Mr. Meeks to represent him in this matter.

\* \* \*

MR. BRICE: Judge, so I'm clear. Mr. Meeks—do you wish to speak to me?

THE COURT: Mr. Meeks previously said he didn't want a lawyer. Then he—he goes back and forth. I don't know—

\* \* \*

\*\*\* [Y]ou will stand if you would, Mr. Brice, as an officer of the court available to assist Mr. Meeks if he chooses to utilize your assistance."

On the next court date, April 6, 1989, defendant appeared *pro se* and filed a motion to have counsel other than an assistant public defender appointed. The trial court struck any appointment of the assistant public defender and asked whether defendant wanted to represent himself. Defendant stated that he did.

Defendant then presented various *pro se* motions, including a motion to dismiss the case. After a lengthy argument by defendant, the court adjourned for lunch. Following the lunch break, the trial court again inquired as to whether defendant wanted to proceed *pro se* or with the assistance of the public defender. Defendant stated that he wanted to proceed *pro se*. The trial court then asked defendant whether he wanted an assistant public defender to act as an advisor. Defendant said that he had a conflict of interest with the public defender's office. The following then occurred on the record:

"THE COURT: Okay. Well, I understand that's your position. Now, if you would answer my question. Do you wish to have Mr. Brice, and it would be Mr. Brice, his assistance as an advisor in this matter at this time?

THE DEFENDANT: I would be willing to confer with him, your Honor.

THE COURT: Okay. Very good. Let's get Mr. Brice up here. I don't want to proceed without him."

The court then recessed until Brice was able to be in the courtroom. After the recess, defendant continued to argue his *pro se* motion to dismiss, which was denied. The trial court then asked defendant when he wanted to set the case for trial and whether he still wanted to represent himself. Defendant asked for April 20, 1989, for motions. The State requested that the court set April 20, 1989, as a cut-off date for motions. The trial court refused, stating that the court was not going to preclude defendant from filing any appropriate motions.

On April 20, 1989, defendant appeared *pro se* and filed a motion to vacate the April 6, 1989, order, which denied his motion to dismiss. Defendant presented his lengthy argument, which consists of over 19 pages in the transcript. The court denied the motion.

Defendant asked for a continuance before trial. When the trial court again asked defendant whether he still wanted to proceed *pro se*, the following occurred on the record:

"MR. MEEKS: Without the office of the public defender. However, I have no objection to a—to appointment of counsel other than the public defender.

THE COURT: There's been no indication for any reason why I should appoint anyone other than the public defender. So, we will set this matter for trial.

MR. MEEKS: At this time, your Honor, I would request appointment of counsel other than the public defender by filing an oral motion, if I may?

THE COURT: Okay. What's the basis for that request?

MR. MEEKS: That I would need the assistance of counsel in this particular case. I'm incarcerated. I'm no, no position—

THE COURT: Wait. Wait a minute, Mr. Meeks. You have been telling me for the last 6 months you didn't want a lawyer.

MR. MEEKS: I didn't want a public defender. I still don't.

THE COURT: You never said that. Never said that. You said you didn't want a lawyer.

MR. MEEKS: Every petition I filed, your Honor—

THE COURT: Fine. How quickly can we get a lawyer? We're going to give you a lawyer and set the case for trial. Then, we're not going to worry about anything else.

THE CLERK: We need about a week and you also have to contact the Chief Judge.

THE COURT: We'll do that today. We'll expect you a week from today, Mr. Meeks. Your lawyer will be here.

MR. MEEKS: Thank you.

THE COURT: Excuse me. Excuse me. Strike what I previously said. We're going to call him—just leave him right here. I'll be right with you. What is the basis for appointment for an attorney other than the public defender, Mr. Meeks.

MR. MEEKS: *** there is a conflict of interest.

THE COURT: What's the conflict of interest?

MR. MEEKS: Mr. Babb—

THE COURT: Mr. Babb is gone.

MR. MEEKS: And Mr. Brice have continuing commitments of the Office of the Public Defender.

THE COURT: They have a commitment to the Office of the Public Defender.

MR. MEEKS: A continuing commitment.

THE COURT: That's the basis of your request for an attorney other than the public defender?

\* \* \*

MR. MEEKS: I would think that, your Honor, based upon the facts and circumstances of the case, the events I would say a conflict of interest exists. I would not be comfortable with them and I'd ask for appointment of counsel other than the public defender.

\* \* \*

THE COURT: What's the conflict. Because they are with that office. That's not a conflict.

MR. MEEKS: My position, your Honor, is that both or any public defender of Cook County, both has a continuing commitment to the Office of the Public Defender. Now—

THE COURT: I don't know what that means. I don't know what that means, but I'll tell you who they have a commitment to, Mr. Meeks. They have a commitment to their clients. That's who they have a commitment to and their clients come before their office. And that's demonstrated on a daily basis in this courtroom. So, if that's the basis for your requesting an attorney other than the public defender, that request will be denied.

\* \* \*

Request for an appointment of an attorney other than the public defender will be denied. Public defender will be appointed to represent Mr. Meeks."

On June 7, 1989, assistant public defender Edward Ptacek appeared on behalf of defendant. Two weeks earlier, Ptacek had requested and was granted a fitness hearing for defendant. When defendant was taken to the psychiatric institute, he refused to speak with the doctor. During the June 7, 1989, court hearing, the trial court refused to force defendant to speak to a doctor. Taking notice of the numerous *pro se* motions filed and the lengthy hearings held, the trial court determined that defendant was fit for trial, which was set for June 12, 1989.

On June 12, 1989, Ptacek again represented defendant in court. The following occurred on the record:

"THE COURT: Okay. Now, do you wish the services of Mr. Ptacek to represent you in this matter?

MR. MEEKS: I requested counsel other than the public defender and the court—

THE COURT: That, respectfully, was denied. Now do you wish Mr. Ptacek to assist you—to represent you in this matter?

MR. MEEKS: I would—than [*sic*] I would.

THE COURT: Well, can you answer my question? Do you want Mr. Ptacek to represent you in this matter?

MR. MEEKS: Only if I can—only if I can proceed as co-counsel."

The trial court then admonished defendant about the charges against him, the possible penalties, and his right to counsel. As part of the admonishment, the trial court asked if defendant wanted the court to appoint an attorney to represent him. Defendant responded, "other than the public defender, yes sir." When the court denied the request, defendant requested to act as co-counsel with the public defender and the trial court agreed.

Both Ptacek and defendant filed pretrial motions. Defendant's motions included a motion for reconsideration of his recusal motion. The motions were considered and ruled on with defendant being given the opportunity to fully argue his *pro se* motions.

The State then requested a clarification of who was representing defendant. Ptacek indicated that he wanted to do all the questioning of witnesses and then consult with defendant about any further questions. Defendant stated that he may or may not have a problem with that procedure. The trial court then noted that this arrangement would be an appropriate way to deal with any problems that might arise and that defendant could ask for a sidebar at any time. Defendant argued that he would be at a disadvantage because he wanted to personally question some of the State's witnesses. Defendant, however, refused to specify which witnesses he wanted to question.

Next, the judge stated that he would introduce Ptacek to the jury as defendant's attorney unless defendant objected. Defendant said that he objected all along. After a short discussion, the judge indicated that it was his understanding that defendant was accepting Ptacek as his attorney. If defendant was in fact accepting Ptacek as his attorney, the judge would introduce him as defendant's attorney. Defendant did not object.

Defendant then complained about having to relay questions to Ptacek. The judge explained that defendant would essentially be acting as second chair to Ptacek, which is the usual procedure when there is more than one defense attorney. Defendant stated that he wanted to actively participate in the trial and to question the State's witnesses. The trial court denied his request.

During the trial, defendant participated in numerous sidebars. After Ptacek completed his cross-examination of Heath, defendant requested a sidebar during which he asked the court if Heath could be

cross-examined regarding her July 1988 eviction from her apartment. Defendant informed the court that he helped Heath find a new apartment even though he was not living with her at the time. In addition, Heath told a real estate agent that she and defendant were to be married. Defendant also wanted Heath cross-examined about an August 13, 1988, incident that precipitated the break-up of defendant and Heath. Defendant stated that it was important for the jury to know that he and Heath were together as common law husband and wife as of August 13, 1988.

Stating that Heath had already testified that she and defendant were living together as common law husband and wife until August 13, 1988, the court refused the request.

During the cross-examination of Terry Johnson, Ptacek informed the court in a sidebar that defendant wanted to participate in the cross-examination. The trial court refused.

After the testimony of the next three witnesses, defendant informed the judge that he wanted to be excused from the courtroom for any further proceedings except sentencing. Defendant stated that he did not agree with Ptacek's defense theory, that defendant committed the lesser offense of aggravated battery, not attempted first degree murder, because he did not intend to kill Heath. Instead, defendant wanted to present his own theory, which was that Heath provoked him into shooting her by being romantically involved with other men. After admonishing defendant of his rights, the trial court allowed defendant to be absent for the remainder of the State's case in chief.

The United States and Illinois Constitutions guarantee that an accused has the right to self-representation. (U. S. Const., amends. VI, XIV; *Faretta v. California* (1975), 422 U. S. 806, 819-20, 45 L. Ed. 2d 562, 572-73, 95 S. Ct. 2525, 2533; Ill. Const. 1970, art. I, §8.) In order to proceed *pro se,* however, the accused must knowingly and intelligently waive his constitutional right to counsel. (*Faretta,* 422 U.S. at 835, 45 L. Ed. 2d at 581, 95 S. Ct. at 2541.) The waiver must be clear and unequivocal. *Faretta,* 422 U. S. at 835, 45 L. Ed. 2d at 582, 95 S. Ct. at 2541.

Even when a *pro se* defendant insists that he is not waiving his *Faretta* rights, his solicitation of or acquiescence in certain types of participation by counsel substantially undermines later protestations that counsel interfered unacceptably. (*McKaskle v. Wiggins* (1984), 465 U.S. 168, 182, 79 L. Ed. 2d 122, 136, 104 S. Ct. 944, 953.) A defendant's *pro se* efforts can be undermined by his own frequent changes of mind regarding counsel's role because it makes it very difficult to determine how much of counsel's participation was in fact

contrary to the defendant's desires of the moment. (*McKaskle*, 465 U.S. at 182-83, 79 L. Ed. 2d at 136, 104 S. Ct. at 953.) Once a *pro se* defendant agrees to any substantial participation by counsel, subsequent appearances by counsel must be presumed to be with the defendant's acquiescence, at least until the defendant expressly and unambiguously renews his request that standby counsel be silenced. *McKaskle*, 465 U.S. at 183, 79 L. Ed. 2d at 136, 104 S. Ct. at 953.

Furthermore, a defendant can waive the right to self-representation through subsequent conduct indicating that he is vacillating or has abandoned his request altogether. (See, *e.g., Tuitt v. Fair* (1st Cir. 1987), 822 F.2d 166; *Brown v. Wainwright* (5th Cir. 1982), 665 F.2d 607; *United States v. Bennett* (10th Cir. 1976), 539 F.2d 45, *cert. denied* (1976), 429 U.S. 925, 50 L. Ed. 2d 293, 97 S. Ct. 327.) In addition, a trial court may require a defendant to choose between proceeding to trial with an unwanted attorney or representing himself provided that the court was not arbitrary in its refusal to continue to allow the dismissal of present counsel. *Wilks v. Israel* (7th Cir. 1980), 627 F.2d 32, 35-36.

We find that defendant did not clearly and unequivocally waive his right to counsel. Instead, the record indicates that he attempted to manipulate the proceedings by alternately accepting and refusing the services of his appointed counsel. Thus, the trial court did not deprive defendant of his right to self-representation by allowing the assistant public defender to conduct the entire defense. The trial court patiently endeavored at all times to strike a fair and reasonable balance between defendant's rights to counsel and self-representation.

Next, defendant asserts that he is entitled to a new post-trial motion hearing because the trial court denied his *pro se* motions to inquire into the assistant public defender's ineffectiveness and for a continuance to prepare a post-trial motion. Defendant's *pro se* post-trial motion claimed the ineffectiveness of counsel related to the State's alleged knowing use of perjured testimony involving an offer of $25,000 to Heath to testify against defendant. Defendant also filed a motion for a continuance to allow him time to prepare a post-trial motion, alleging that he had no access to the law library or copy machines because the Cook County jail was on deadlock. Defendant argues that the trial court's actions deprived him of his right to self-representation.

We disagree. After the trial court denied Ptacek's post-trial motion with no argument, it granted defendant's motion to proceed *pro se* and discharged the assistant public defender. The trial court

then denied defendant's motion for a continuance. Although the trial court did not allow oral argument on defendant's *pro se* motion, the record indicates that the trial court did consider the motion. The judge stated that the *pro se* motion set forth only allegations already made by defendant at various times during the trial and pretrial proceedings.

The judge then allowed Assistant State's Attorney Quattrocchi to testify regarding defendant's post-trial motion allegations. She denied all the allegations, but defendant declined to cross-examine her.

When the trial court listens to the defendant's complaints and is adequately apprised of the facts underlying the claims of ineffectiveness, it does not have to hold a full-fledged hearing if it characterizes the complaints as relating to trial strategy. (*People v. Davis* (1991), 208 Ill. App. 3d 33, 43, 566 N.E.2d 932.) Although the trial court denied oral argument on this issue, it was fully apprised of the facts underlying defendant's claim of ineffectiveness of counsel. Defendant was not prohibited from presenting his motion. Therefore, the trial court did not err in denying defendant's *pro se* motions.

We also find that the trial court did not abuse its discretion in denying the motion for continuance since defendant failed to show that it prejudiced him. A conviction will not be reversed because of a denial of a motion for a continuance unless the denial resulted in prejudice or embarrassment to defendant (*People v. Reyes* (1981), 102 Ill. App. 3d 820, 836, 429 N.E.2d 1277) or in some way impeded his preparation of his defense. The burden of establishing such prejudice is on defendant. (*People v. Killings* (1986), 150 Ill. App. 3d 900, 906, 501 N.E.2d 1363.) Defendant did not meet that burden.

Next, defendant asserts that he did not make a valid waiver of his right to counsel at sentencing because the trial court failed to admonish him of the nature of the offenses and the minimum and maximum sentences he faced in accordance with Supreme Court Rule 401. (134 Ill. 2d R. 401.) We disagree.

When a defendant requests to waive counsel, the trial court must inform the defendant and determine that he understands the nature of the offense, the minimum and maximum possible sentences, and his right to counsel. (*People v. Baker* (1983), 94 Ill. 2d 129, 132, 445 N.E.2d 769.) If the defendant had been represented by counsel at trial, as in this case, the trial court must admonish him before allowing him to represent himself at the sentencing hearing. *People v. Langley* (1992), 226 Ill. App. 3d 742, 748-49, 589 N.E.2d 824.

The purpose of Rule 401 is to eliminate any doubt that the defendant understands the charge against him and its consequences

and to preclude a defendant from waiving the right to counsel without full knowledge and understanding. (*People v. Love* (1985), 139 Ill. App. 3d 104, 114, 486 N.E.2d 1337.) If it appears that a defendant has a high level of sophistication, strict compliance with the rule is not required. (*People v. Jackson* (1978), 59 Ill. App. 3d 1004, 376 N.E.2d 685.) When deciding whether the defendant knowingly and intelligently waived his right to counsel, the entire record should be considered. (*People v. Barker* (1975), 62 Ill. 2d 57, 59, 338 N.E.2d 385.) Substantial compliance with Rule 401(a) is sufficient to effectuate a valid waiver of counsel if the record indicates that the waiver was made knowingly and intelligently. *People. v. Coleman* (1989), 129 Ill. 2d 321, 333, 544 N.E.2d 330.

■ It is clear from the record that defendant's waiver of counsel at sentencing was knowing and intelligent. Not only was defendant fully admonished on December 9, 1988, and June 12, 1989, but defendant is obviously very sophisticated in the legal process. Defendant has previous convictions, substantial experience with the legal system, and filed over 15 thorough *pro se* petitions and motions that included extensive case law. Moreover, defendant asserted that he had 20 years' experience with the law. Under these circumstances, we conclude that there was no violation of Rule 401(a).

Finally, defendant asserts that he is entitled to a new sentencing hearing because the trial court forced him to proceed to the hearing unprepared. Specifically, defendant argues that the trial court denied his motion for continuance even though it granted his motion to proceed *pro se* and the presentence report was not made available to him until immediately prior to the start of the hearing.

■ Defendant's argument is groundless. Although he alleged prejudice, he did not substantiate his claim. Defendant knew three weeks earlier that the hearing was set for that date. In addition, he was planning to file his motion to proceed *pro se* during the sentencing hearing. Thus, defendant should have been prepared to present any evidence in mitigation.

Based on the foregoing, the circuit court judgments are affirmed.

Affirmed.

RIZZI and GREIMAN, JJ., concur.